627 S.E.2d 718

## SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,

v.

### Angelica SEEGARS, John Doe, and L.J. Parker, Defendants,

of whom Angelica Seegars is Appellant.

In re Brionica Ja'zyra Seegars, 10–06–99; Javarus Kaleel Seegars, 07–11–02; Children under the age of eighteen.

No. 26119.

Supreme Court of South Carolina.

Heard Feb. 2, 2006.

Decided Feb. 27, 2006.

Rehearing Denied April 6, 2006.

624

William P. Davis, of Baker, Ravanel & Bender, L.L.P., of Columbia, for Appellant.

Deborah Murdock, of Greenville, for Respondent.

Marion H. (Mark) Grier, Jr., of Lancaster, for Guardian Ad Litem.

Justice BURNETT:

Angelica Seegars (Appellant) appeals the family court's termination of her parental rights to Brionica Ja'zyra Seegars and Javarus Kaleel Seegars (Children). We affirm as modified.

## FACTUAL/PROCEDURAL BACKGROUND

On October 22, 2002, the South Carolina Department of Social Services (DSS) took Children into emergency protective custody because Javarus had been hospitalized for severe injuries from a nonaccidental trauma. On October 16, 2003, in a formal order of removal, the family court found injuries to Javarus's brain, toes, neck, and leg occurred while in the care of another but under the direction of approval of Appellant and found injuries to Javarus's arm and ribs occurred while in Appellant's direct care and control. The family court further found Brionica was at a substantial risk of abuse because of the severity of Javarus's physical abuse by Appellant. The family court also ordered Appellant to pay monthly child support for Children in the amount of $248.00 with court costs of five percent.[1]

---

1. In addition to the child support, the family court ordered Appellant to undergo a psychological evaluation and follow any recommendations made as a result of the evaluation; to complete additional parenting classes specific to nutrition and care of small children; to participate in individual counseling; to demonstrate suitable and stable housing for

On April 9, 2004, DSS commenced this action for termination of parental rights (TPR) against Appellant, John Doe, and L.J. Parker. DSS sought termination of Appellant's parental rights pursuant to S.C.Code Ann. § 20–7–1572(1), (2), (4), (6), and (8) (1976 & Supp.2005) and termination of parental rights of Parker and Doe pursuant to S.C.Code Ann. § 20–7–1572(3), (4), (7), and (8).

At the TPR hearing, Dr. William Lehman, an orthopedic surgeon, testified he treated Javarus on September 25, 2002, for a fracture of the upper arm bone. On October 8, 2002, Lehman treated Javarus for skull and rib fractures. He testified the skull injury led to significant and permanent brain damage, and he concluded Javarus's injuries were not accidental. He further testified Javarus was two years old at the time of hearing, but functioning, intellectually and physically, at a six month level.

Carol Tiedeman, Javarus's physical therapist, testified she began his therapy on January 7, 2003. According to Tiedeman, Javarus had neurological damage and vision and hearing impairments and had been diagnosed with battered child syndrome and shaken baby syndrome. She testified that Javarus's foster mother brought him to the appointments and did home therapy with Javarus. She stated she had never met or talked to Appellant.

Chrys Tuttle, a foster care case worker for DSS, was assigned to Children's case. According to Tuttle's records, Appellant alleged she had five places of employment since Children had been in foster care, but Tuttle was unable to verify Appellant's employment history. She opined Appellant had not demonstrated stable employment for a period of six months because she had not had any one job for a six month period. Tuttle testified her records indicated eight residences for Appellant since Children had been in foster care, including a one bedroom apartment in Charlotte, North Carolina where Appellant had been living since February 28, 2004.

herself and Children prior to their return to her care; to demonstrate stable employment for a period of six months prior to the return of Children. The family court further ordered that Appellant could attend any and all of Javarus's medical and therapy appointments and educate herself on the details of Javarus's ongoing care.

Tuttle testified Appellant attended four of twenty scheduled medical appointments for Javarus, none of Javarus's twenty-three emergency medical appointments, and none of Javarus's one hundred, at least, physical, speech, and occupational appointments. She also testified there were prospective adoptive placements available for Children and in her opinion termination of Appellant's parental rights was in the best interests of Children.

According to family court records, Appellant's child support began on October 17, 2003. Appellant paid $20.00 on October 17, 2003, and $50.00 on October 31, 2003. The deputy clerk of the family court testified Appellant was in arrears $3,054.80 as of the date of the TPR hearing.

Appellant testified to four places of employment and four to five residences since the formal removal order. She testified she would begin working at Mercy Hospital in Charlotte, North Carolina, the week following the hearing and she had been working at Presbyterian Hospital in Charlotte since June 2004. She testified she worked at Burger King Corporation in Charlotte from February to June 2004, and she worked at Goodwill Industries from September 2003 to November 2003.[2]

Appellant testified she gave Children toys, money, and gifts during visits and for their birthdays and Christmas. She also asserted she had insufficient funds to pay the court-ordered child support because her employment with Goodwill ended in November 2003. She further testified she wrote "a letter to Columbia to let them know what my status was with child support and to be patient with me and I would try to clear it up as soon as I could." Appellant testified the family court records were incorrect because she had made more than two payments.

By agreement, a written evaluation from Dr. Lisa Jackel, a licensed clinical psychologist who conducted a psychological evaluation of Appellant, was admitted in lieu of her live testimony. She diagnosed Appellant with schizotypal person-

---

**2.** Based on check stubs presented into evidence, Appellant received compensation from Presbyterian Hospital for the pay periods ending July 24, 2004, and September 18, 2004; from Burger King for March 24, 2004 to July 15, 2004, and from Goodwill Industries for August 19, 2003 to November 26, 2003.

ality disorder and alleged physical and sexual abuse. Dr. Jackel concluded that Appellant "is not currently or likely ever capable of appropriately caring for her children, financially, emotionally, or intellectually."

By agreement, a letter from Dr. Russell Hancock, Appellant's current psychologist, was admitted in lieu of his live testimony. He diagnosed Appellant with adjustment disorder and schizotypal personality disorder. He explained the difference between a personality disorder and a psychotic disorder.

The guardian ad litem recommended termination of parental rights and found termination was in Children's best interests.

On November 15, 2005, the family court judge entered a Final Order for Termination of Parental Rights, terminating Appellant's parental rights based on S.C.Code Ann. § 20–7–1572(4), (6), and (8). The family court also terminated the alleged fathers' parental rights on the grounds of S.C.Code Ann. § 20–7–1572(3), (4), (7), and (8).[3] The family court denied Appellant's motion to alter or amend the judgment and for reconsideration, or, in the alternative, for a new trial. Appellant appeals and we certified this case for review from the Court of Appeals under Rule 204(b), SCACR.

### ISSUES

I. Did the family court err in terminating Appellant's parental rights because she willfully failed to support the children for a period in excess of six months, S.C.Code Ann. § 20–7–1572(4), or because she had a diagnosable condition that is unlikely to change within a reasonable time and made it unlikely that she could provide minimally acceptable care for the children, S.C.Code Ann. § 20–7–1572(6)?

II. Does the termination of Appellant's parental rights based on S.C.Code Ann. § 20–7–1572(8) violate her due process rights?

---

**3.** Those terminations have not been appealed and are the law of the case. *Charleston Lumber Co. v. Miller Housing Corp.,* 338 S.C. 171, 175, 525 S.E.2d 869, 871 (2000) (unappealed ruling is the law of the case). Parker also executed a voluntary relinquishment of parental rights as to Javarus, which was filed on April 30, 2004, and took a paternity test which indicated he was not Javarus's biological father.

## STANDARD OF REVIEW

The family court will terminate parental rights and free a child up for adoption if it finds that one of the nine statutory grounds for termination has been ' met and that "termination is in the best interest of the child." S.C.Code Ann. § 20–7–1572. The family court judge terminated Appellant's parental rights pursuant to three statutory grounds. *Id.* § 20–7–1572(4), (6), & (8). DSS must prove these grounds by clear and convincing evidence. *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Richland County Dep't of Soc. Servs. v. Earles,* 330 S.C. 24, 496 S.E.2d 864 (1998). When reviewing the family court decision, this Court may make its own conclusion as to whether DSS proved by clear and convincing evidence that parental rights should be terminated. *S.C. Dep't of Soc. Servs. v. Cochran,* 356 S.C. 413, 589 S.E.2d 753 (2003). The reviewing court, however, is not required "to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony." *Hooper v. Rockwell,* 334 S.C. 281, 297, 513 S.E.2d 358, 367 (1999).

## *LAW/ANALYSIS*

### I. Termination of Parental Rights

### A. Willful Failure to Support

Appellant argues the family court erred in terminating her parental rights on the ground she failed to support Children or make any material contribution to their care for a period in excess of six months. We disagree.

Under S.C.Code Ann. § 20–7–1572(4) the family court may order termination of parental rights if:

The child has lived outside the home of either parent for a period of six months, and during that time the parent has wil[l]fully failed to support the child. Failure to support means that the parent has failed to make a material contribution to the child's care....The court may consider all relevant circumstances in determining whether or not the parent has wil[l]fully failed to support the child, including

requests for support by the custodian and the ability of the parent to provide support.

Whether a parent's failure to support a child is "willful" within the meaning of the statute is a question of intent to be determined in each case from all the facts and circumstances. *S.C. Dep't of Soc. Servs. v. Broome*, 307 S.C. 48, 52, 413 S.E.2d 835, 838 (1992). Conduct of the parent which evinces a settled purpose to forego parental duties may fairly be characterized as "willful" because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent. *Id.* at 53, 413 S.E.2d at 839.

First, Appellant argues we should reverse the family court's termination of her parental rights because the family court did not find her failure to support Children was willful. Regardless of the family court's findings, we may make our own conclusions as to whether DSS proved by clear and convincing evidence that parental rights should be terminated. *Cochran*, 356 S.C. at 417, 589 S.E.2d at 755.

Second, Appellant argues the family court erred because she made material contributions in accordance with her means. Appellant asserts the two partial payments toward child support and her testimony that she gave Children toys, gifts, and money are evidence of material contribution.

"Material contribution" is defined as "either financial contributions according to the parent's means or contributions of food, clothing, shelter, or other necessities for the care of the child according to the parent's means." S.C.Code Ann. § 20–7–1572(4). Toys are not included in this definition and will not be considered by us in concluding whether Appellant made a material contribution to Children.

Children were taken into emergency protective custody on October 22, 2002 and were formally removed from Appellant's care on October 16, 2003 by order of the family court. In eleven months, Appellant made two partial child support payments totaling $70.00, and she owed $3,054.80 in child support on the date of the TPR hearing. If Appellant had insufficient funds to make child support payments, she could have petitioned the family court to reduce child support. Appellant's failure to pay court-ordered child support or give a reasonable excuse for her failure to pay manifests a conscious

indifference to the rights of Children to receive support, and is therefore a willful failure to support. *See S.C. Dep't of Soc. Servs. v. Headden,* 354 S.C. 602, 582 S.E.2d 419 (2003) (affirming family court's finding of willful failure to support where mother made some payments after being ordered by the court, then inexplicably stopped for 16 months, and although mother had caught up with her support payments by the time of the TPR hearing, the family court was able to look beyond the months immediately preceding the TPR action at the mother's overall conduct.); *S.C. Dep't of Soc. Servs. v. Cummings,* 345 S.C. 288, 547 S.E.2d 506 (Ct.App.2001) (affirming family court's finding mother's failure to support was willful when mother made only one child support payment of $15 during 14 months and owed $490 in child support on the day of the TPR hearing even though she paid $457 to the court that day).

The guardian ad litem and DSS case worker both testified termination would be in the best interests of Children. Also, Dr. Jackel testified Appellant was not currently or would likely ever be capable of caring for Children. Based on the above facts, we conclude there is clear and convincing evidence that Children have lived outside Appellant's home for a period of at least six months and during that time Appellant has willfully failed to support the Children, and we conclude termination of Appellant's parental rights is in the best interests of Children.

## B. Diagnosable Condition

 Appellant argues the family court erred in terminating her parental rights because she has a diagnosable condition unlikely to change within a reasonable time and which makes her unlikely to provide minimally acceptable care of Children. We disagree.

Appellant argues DSS failed to present clear and convincing evidence that her personality disorder makes her unlikely to provide minimally acceptable care of Children. She also argues the family court erroneously relied on Dr. Jackel's evaluation because the evaluation is too vague, uncertain, and empty of evidence to support its conclusions and thus has no probative value.

Under S.C.Code Ann. § 20–7–1572(6), the family court may order termination of parental rights if:

The parent has a diagnosable condition unlikely to change within a reasonable time including, but not limited to, alcohol or drug addiction, mental deficiency, mental illness, or extreme physical incapacity, and the condition makes the parent unlikely to provide minimally acceptable care of the child.

The family court terminated Appellant's parental rights, in part, because she has a diagnosable condition of schizotypal personality disorder. Dr. Jackel described schizotypal personality disorder as "includ[ing] odd thinking and beliefs, suspiciousness due to paranoid ideation, inappropriate affect, odd/eccentric behavior, lack of close friendships and social anxiety due to paranoid fears, and unusual perceptual experiences." From Appellant's personality test results, Dr. Jackel surmised Appellant "may be more imaginative and her defense mechanism may be reliance on fantasy, neglecting practical matters, which may contribute to her denial of her son's medical condition and permanent disabilities."

In light of her findings, Dr. Jackel concluded:

"[Appellant] is not currently or likely ever capable of appropriately caring for her children, financially, emotionally, or intellectually. She can not care for her son's medical problems if she does not admit he has any problems. She did not verbalize any medical problems, need for therapies, or special medical care he requires. . . . [Appellant's] personality profile suggests that she is likely to be disorganized and she may feel ineffective in her ability to cope with life. She may be more imaginative and not pay attention to practical matters. She can not be trusted to follow through on what she says she will do. She also has personality traits which may cause her to be prone to developing an addiction. . . . It appears that [Appellant] is unable to take care of herself never mind her children as she has not maintained steady employment or housing since her children have been in [foster] care."

At the TPR hearing, Appellant described Javarus's medical problems and stated he required around the clock care and

was fed through a feeding tube. Yet, the guardian ad litem's report supports Dr. Jackel's conclusions.[4]

We conclude there is clear and convincing evidence that Appellant has a diagnosable condition—schizotypal personality disorder—which is unlikely to change within a reasonable time, and this condition makes Appellant unlikely to provide minimally acceptable care of Children. The evidence shows Appellant denied the severity of Javarus's condition, had difficulty dealing with practical matters, failed to maintain steady employment, failed to maintain a stable home, and failed to establish she had reliable transportation. *See Orangeburg County Dep't of Soc. Servs. v. Harley*, 302 S.C. 64, 393 S.E.2d 597 (Ct.App.1990) (affirming family court's termination of mother's parental rights, in part, under § 20–7–1572(6) where mother had a low mental status which was unlikely to improve in the future, difficulty in caring for herself, poor impulse control, low frustration level, and difficulty responding to simple statements and directions and where mother had failed to maintain a stable residence— twelve homes in a little over two years—and could not manage her own finances). Further, termination of Appellant's parental rights is in the best interests of Children.

## II. Due Process Rights

Appellant argues the family court erred in terminating her parental rights under S.C.Code Ann. § 20–7–1572(8) because this subsection violates her due process rights.

Because we affirm the family court's termination of Appellant's parental rights under S.C.Code Ann. § 20–7–1572(4) and (6), we decline to address Appellant's constitutional issue. *See Fairway Ford, Inc. v. County of Greenville*, 324 S.C. 84, 86, 476 S.E.2d 490, 491 (1996) ("[I]t is this Court's firm policy to decline to rule on constitutional issues unless such a ruling is required."); *see also Headden*, 354 S.C. at 613, 582 S.E.2d at

---

4. The guardian ad litem found, "If [Javarus] is returned to [Appellant], she would not be able to care for him and be able to take him at a moment's notice to a hospital if needed since transportation has sometimes become an issue during scheduled visitation.... She is unable to explain the severity of his injuries nor the requirements needed to feed him, medicate him, [and] provide therapy for him or his day-to-day care in general."

425 (declining to address the issue of whether a mother's due process rights were violated because the family court terminated her parental rights under § 20-7-1572(8) when this Court found clear and convincing evidence existed to affirm TPR based on willful failure to visit and support); *Cochran*, 356 S.C. at 420, 589 S.E.2d at 756 (same).

## CONCLUSION

For the foregoing reasons, we affirm as modified the family court's termination of Appellant's parental rights based on S.C.Code Ann. § 20-7-1572(4) and (6) and decline to address termination under § 20-7-1572(8).

**AFFIRMED AS MODIFIED.**

TOAL, C.J., MOORE, PLEICONES, JJ., and Acting Justice JAMES W. JOHNSON, JR., concur.