THIS OPINION HAS NO PRECEDENTIAL VALUE.   IT SHOULD NOT BE CITED OR RELIED ON AS 
 PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
South Carolina Department of Social Services, Respondent,
v.
Jane Doe, Richard Roe, and John Doe, Monte [DOB: 08/21/97], Adam [DOB: 03/23/99, David [DOB: 03/03/00], and Jordan [DOB: 05/01/01], minors under the age of 18,
Defendants,
Of whom Jane Doe and Richard Roe are Appellants.
 
 
 

Appeal From Williamsburg County
R. Wright Turbeville, Family Court Judge

AFFIRMED

Unpublished Opinion No. 2006-UP-342
Submitted October 1, 2006  Filed October 11, 2006

 
 
 
Charles T. Brooks, III, of Sumter, for Appellant Jennifer Emelander.
William M. OBryan, Jr., of Kingstree, for Appellant Benjamin Mitchell.
Deborah T. Nielsen and Dwight C. Moore, of Sumter, for Respondent.
Eugene P. Corrigan, III, of Charleston, for Guardian Ad
Litem.
 
 
 

PER CURIAM:  Jane Doe (Mother) and Richard Roe (Father) appeal the termination of their parental rights (TPR) to their minor children.[1]  We affirm.[2] 
FACTS
Mother and Father are the biological parents of three minor children.  Mother is also the parent of a fourth minor child, whose father is unknown and identified in these proceedings as John Doe.[3]  
On September 12, 2002, the parents two-year old son cut his arm on broken glass while playing unattended in the familys yard.  The child received emergency treatment at a local hospital, which notified the South Carolina Department of Social Services (DSS) that a possible child neglect situation existed.  DSS immediately investigated the family residence, where it discovered generally squalid and unsafe conditions.  DSS also found Mother was unable to control the children and was rearing them alone while Father remained incarcerated on pending charges related to his alleged rape of an eighty-year old woman. 
The family court held a removal hearing on September 13, 2002. Mother voluntarily placed the children in DSS custody and admitted exposing them to a threat of harm of physical neglect. The family court ordered a treatment plan requiring, among other things, that Mother provide a safe and stable home for the children, undergo a mental health assessment, secure stable employment, and complete anger management counseling.  The plan required both parents to undergo psychological evaluations to assess their parenting abilities, submit to substance abuse assessments, and repair and clean the family residence.  Additionally, the plan required the parents to successfully complete domestic violence counseling if they resumed cohabitation.  This order was not appealed.
In July 2003, Father was released from jail after his alleged victim died and the charges against him were subsequently dismissed.  He then moved back into the family residence, returned to work, and began participating in his treatment plan.  In particular, he made improvements to the family residence to make it safer for the children, engaged in the required counseling, and submitted to drug screenings.
The family court returned physical custody of the children to the parents on February 9, 2004.  At the time, Mother and Father had made improvements to the family residence to make it safer for the children to inhabit.  However, the court found Mother was incapable of caring for the children alone and returned the children on the condition that Father be available to care for the children while at home.    
On the evening of June 23, 2004, Father was stabbed while shooting pool at a local club.  Thereafter, he was hospitalized for several days.  No other family members appeared genuinely willing to help Mother care for the children, so the parties agreed to return physical custody of the children to foster care.    
Father tested positive for alcohol use in a September 2004 drug screening.  In December 2004, he tested positive for cocaine use in a hair follicle test.  He was charged with driving under the influence of alcohol (DUI) that same month and later pled guilty to the charge.  Mother abandoned her treatment plan in December 2004 and moved to Dalton, Georgia, where she had previously lived.  Father also abandoned his treatment plan.
DSS initiated the present action in February 2005.  A merits hearing on the TPR action took place on August 16, 2005.  At that hearing, DSS presented testimony from a psychologist, a foster care worker, and counselors familiar with the case.  Mother and Father testified.  The childrens guardian ad litem also testified.
DSS provided the deposition of Dr. Robert W. Noelker, a clinical psychologist who examined Mother and Father shortly after the children were taken into DSS custody.  Dr. Noelker diagnosed Mother as a special needs adult with mild mental retardation and brain damage possibly caused by oxygen deprivation suffered when she was in a house fire as a small child.  He also diagnosed Mother with depression and anxiety.  Dr. Noelker added Mother was functionally and occupationally illiterate, with essentially no reading, spelling, or basic math skills.  He opined that, given Mothers multiple deficits, she would never be able to independently parent her minor children, regardless of rehabilitation provided by DSS.  Instead, Mother would be much like another child in home that would need direction and guidance from another adult and would not be capable of providing meaningful daily regulation or interaction for her children.   
Dr. Noelker diagnosed Father with polysubstance dependence and antisocial personality disorder.  He testified that a person with an antisocial personality disorder typically lacks a conscience, tends to be impulsive and self-interested, and tends to repetitively get into trouble with the law or social entities.  Dr. Noelker recommended that, at a minimum, Father secure adequate employment and engage in parent effectiveness classes, random drug and alcohol screening, outpatient substance abuse treatment, and outpatient psychotherapy.  However, given Fathers extensive legal history and the tendency of those with antisocial personality disorder to resist change, Dr. Noelker predicted Father was unlikely to be compliant and that his prognosis would continue to be poor.  
Janie Snow, a clinical counselor from the Williamsburg County Department on Alcohol and Drug Abuse, testified about treatment her agency provided Mother and Father.  According to Snow, her agencys initial assessment of Mother indicated she was cocaine dependent.  Snow testified Mother successfully completed inpatient drug addiction treatment in the summer of 2003, and had not since tested positive for drug use.  However, Snow testified Mothers efforts at parenting classes, couples counseling, and anger management counseling were unsuccessful.  The agency stopped providing services to Mother when she threatened to kill Snow in September 2004.  Mother never successfully completed the counseling ordered by her treatment plan, according to Snow.   
Snow also testified about services Father received from her agency, and primarily chronicled Fathers series of approximately forty drug screenings from May 2003 through December 2004.  Snow stated Father tested positive for alcohol in at least two screenings, with the most recent positive result occurring on September 24, 2004.  According to Snow, Father more often than not tested negatively for drug use.  On many occasions, however, the tests would yield a positive result at the screening site, but later yield a negative result when the same samples were tested again at an off-site lab.  Snow attributed the disparities to variances in testing techniques used, stating on-site testing would indicate positive results if there was any cocaine in [the subjects] system, but the off-site lab would not indicate a positive result unless the subject had a higher level of drugs in his system.  Regardless, off-site lab results from urine samples indicated Father tested positive for cocaine on at least three occasions, and a hair follicle test yielded a positive result for cocaine on December 1, 2004.  Snow testified Father stopped attending substance abuse counseling after being charged with DUI in December 2004.  Snows agency continued to offer substance abuse counseling services to Father and notified him of counseling appointments.  However, Father failed to respond to the notices, and the agency consequently closed his file. 
Gloria Davis, the DSS foster care worker who handled the familys case, testified that when she first visited the family residence, it smelled of urine and feces and was in a state of disrepair with broken windows and rotted flooring.  Davis testified the house had a broken toilet, refrigerator, and oven.  Flies and roaches crawled over a partially-eaten hamburger left on the kitchen counter, no linens were on the beds, and clothing was strewn on the floor, according to Davis.  She found almost no food in the house, although Mother received food stamps.  In the yard, Davis found broken glass and a dangerous fence with barbed wire.  
According to Davis, Mother yelled and screamed at the children, cried uncontrollably, and had no . . . control over the children.  Davis testified the minor children knowingly controlled and manipulated Mother.  Father was their primary caretaker, Davis opined, because Mother was incapable of caring for them alone due to her mental disabilities and lack of family support.  Under the circumstances, returning the children to the parents custody depended on Fathers availability to help rear the children.
Davis testified Father was initially unable to participate in his treatment program because he was incarcerated, but after his release he became vigorously involved in his treatment plan.  Among other things, he made necessary repairs to the family residence, resumed regular employment, submitted to a psychological evaluation, submitted to drug and alcohol abuse assessments, participated in mental health counseling and drug court, and successfully completed inpatient drug and alcohol rehabilitation.  However, she stated Father continued to test positive for drug use and failed to complete outpatient drug treatment, drug court, or mental health counseling.  In December 2004, Father was incarcerated over Christmas after his arrest for DUI, according to Davis.  She added Father had not since participated in the required drug testing or counseling.  According to Davis, Father continued to visit the children monthly and sometimes provide meals and entertainment.  
Davis indicated the conditions that led to the childrens removal would not likely be remedied because Mothers problems were rooted in mental health issues that limited her ability to care for her children and no compelling evidence suggested her family or anyone else was forthcoming with the support needed.  Likewise, Fathers condition impeded his ability to provide the support Mother needed to be a reliable parent independently.  Moreover, the parties separated and no evidence suggested a likelihood of reconciliation.   Davis opined terminating the parents rights to the minor children would be in the childrens best interests.  
Sarah Reynolds, a registered nurse who served as a case manager and clinical counselor at the Waccamaw Center for Mental Health (Waccamaw), testified about mental health services Waccamaw provided Mother.  According to Reynolds, Mother was first referred to Waccamaw by DSS for Family Preservation counseling.  Reynolds testified Mother was diagnosed as being mildly mentally retarded, but Mothers initial treatment was cancelled because of her unwillingness to participate.  The drug court later referred Mother for additional counseling and psychiatric treatment.  Reynolds characterized Mothers compliance with Waccamaws services as unpredictable, noting Mother cancelled appointments and failed to properly take psychiatric medication prescribed under her treatment plan.  For example, she once flushed the medicine down a toilet and on another occasion overdosed on the medicine in a failed suicide attempt.  Waccamaw stopped treating Mother when she moved to Georgia in December 2004, Reynolds stated.  She opined Mother would need mental health treatment indefinitely and 24-hour a day help rearing the children, because if she has an outburst anything could possibly happen that may be harmful to herself or others.  
Mother testified on her own behalf.  She expressed a love for her children and described their removal as a nightmare.  She testified that she lived in an apartment in Dalton, Georgia, where she regularly spent time with her parents, siblings, and friends.  Mother testified she remained drug free but she had otherwise been unable to get her life back on track. 
Father testified he had taken numerous steps to regain custody of his children, including securing steady employment and repairing the family residence to make it safer for the children.  He stated he took the children on outings, provided occasional meals and gifts, and sometimes gave the foster parent money.  However, he admittedly stopped complying with his treatment plan in January 2005 based on his belief that DSS had arranged to place the children with Mothers family in Georgia.  
Father admitted he was addicted to drugs and alcohol but denied having used cocaine since approximately December 2004.  Father claimed he was attending counseling sessions to help him deal with both problems, but later admitted he had only been to one counseling session in the previous eight months.  Father admitted using cocaine shortly after his release from jail on the dismissed rape charges.  Father also admitted using cocaine in November or December of 2004, but disputed the results of the hair follicle test that indicated he used cocaine in December 2004.  When asked about numerous positive results he received on some of his random drug screenings, Father attempted to excuse the results as a health condition.   
Father testified regarding his past legal woes, offering excuses for charges he had faced in the past.  Among other things, he testified to spending time in jail for rape charges that were dropped, a DUI charge to which he pled guilty, and charges he had stolen approximately $14,000 from his grandfather, which were also dropped.  He also admitted he was jailed on a bench warrant for failing to pay court fines related to his DUI.    
Father also testified about his stabbing, which he claimed occurred at a club where he was playing pool and drinking non-alcoholic beer while waiting to conduct business with the clubs owner.  According to Father, a woman with whom he was playing pool stabbed him.  Father indicated the woman harbored anger toward him because on the previous day Father had intervened in an altercation between the woman and her boyfriend.  
The childrens guardian ad litem, Bennett McCollough, described the children as being a handful, and noted they had been diagnosed with hyperactive attention deficiency.  He opined that the children loved their parents, but they also loved their foster mother and referred to her as mother.  McCullough testified the children were sad for Mother and recognized that she was not able to control them.  He added that Father was capable of caring for the children if he would stay out of trouble and not abuse drugs, but advised he would not recommend giving Father additional time to pursue a treatment plan.  McCullough testified he believed the children were better off living with their foster mother, and that neither of their natural parents could provide the stability the children needed.  McCullough specifically testified terminating Mother and Fathers parental rights was in the best interests of the children. 
On September 9, 2005, the family court issued an order terminating the parental rights of Mother and Father.  The court based its termination of Mothers parental rights on findings of neglect too severe and repetitious to likely be remedied within six months; failure to remedy the conditions leading to the childrens removal by successfully completing counseling specified in her treatment plan; and the fact that she had been diagnosed with conditions of mental retardation, adjustment disorder, anxiety, and depression that prevented her from competently parenting her children alone and her diagnosed conditions would not likely change within a reasonable time.  The family court terminated Fathers parental rights on the basis of neglect too severe and repetitious to likely be remedied within six months; failure to remedy the conditions leading to the childrens removal by successfully completing counseling specified in his treatment plan; and the fact that he had been diagnosed with conditions of drug dependency and antisocial behavior that rendered him incapable of providing minimally acceptable care for the minor children and his condition was not likely to change within a reasonable time because he had stopped drug counseling months earlier.  The family court also terminated their parental rights based on its finding that the minor children had been in foster care under DSS custody for at least fifteen of the preceding twenty-two months.  Finally, the court found terminating Mother and Fathers parental rights to be in the childrens best interests.  These consolidated appeals followed.    
STANDARD OF REVIEW
In a TPR action, the best interest of the child is the paramount consideration.  Doe v. Baby Boy Roe, 353 S.C. 576, 579, 578 S.E.2d 733, 735 (Ct. App. 2003).  Before parental rights can be forever terminated, the alleged grounds for the termination must be proven by clear and convincing evidence.  Richberg v. Dawson, 278 S.C. 356, 357, 296 S.E.2d 338, 339 (1982); S.C. Dept of Soc. Servs. v. Parker, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct. App. 1999).  On appeal, this court may review the record and make its own determination whether the grounds for termination are supported by clear and convincing evidence.  S.C. Dept of Soc. Servs. v. Cummings, 345 S.C. 288, 293, 547 S.E.2d 506, 509 (Ct. App. 2001).  Despite this broad scope of review, however, we should not necessarily disregard the findings of the family court, because the family court is in a better position to evaluate the credibility of the witnesses and assign weight to their testimony. Dorchester County Dept of Soc. Servs. v. Miller, 324 S.C. 445, 452, 477 S.E.2d 476, 480 (Ct. App. 1996).
DISCUSSION
I.  Mothers Appeal 

A.  Adequacy of Mothers Treatment Plan

Mother argues the family court erred in finding she failed to complete her treatment plan. Specifically, Mother alleges the plan was inadequate given the circumstances because it required her to rely on assistance from third parties.  She also argues that when DSS learned of her diagnosed conditions it should have modified her treatment plan to enable her to successfully complete the plan.  We disagree. 
As an initial matter, we note Mother never made this argument before the family court, so the issue is arguably unpreserved for appellate review. See Hatfield v. Hatfield, 327 S.C. 360, 369, 489 S.E.2d 212, 217 (Ct. App. 1997) (stating an issue must be
raised to and ruled on by the family court to be preserved for appellate review). Instead, the record indicates she continuously agreed to the treatment plan as defined at the initial removal hearing and as later modified.  The relevant orders reflect Mother agreed to the treatment plans terms, found the treatment plan complied with statutory requirements, and was fair, equitable, reasonable, and . . . in the best interests of the minor children.  Furthermore, the family court consistently used reasonable to describe DSSs efforts to help Mother remedy the problems that caused the childrens removal.  Because Mother agreed to the terms of the treatment plan and never challenged them at the trial level, she consequently waived the right to challenge the plans terms on appeal. 
Assuming Mothers issue is preserved, we, nevertheless, find it lacks merit.  Mother argues the treatment plan was deficient because it made her ability to comply with the plan contingent upon the actions of third parties such as Father and her family.  Although Mothers love for her children is beyond question and her circumstances are tragic, the record contains ample evidence supporting the family courts finding that Mother could not competently rear the children alone.  In particular, Dr. Noelker testified Mother would never be able to provide minimally acceptable care for her minor children without a functional and capable adult to assist her on a daily basis.  Testimony from Davis and McCullough also support the courts finding that Mother could not independently care for the children.  Additionally, Father opined at trial that Mother could not care for the children alone.  Mother did not dispute their testimony at trial, nor does she challenge their veracity on appeal.  
We note DSS unsuccessfully attempted to place the children with Mothers relatives in Georgia, but social services workers there investigated the relatives homes and found they had no serious interest in helping Mother care for the children.  Moreover, the Georgia authorities stated the home of the childrens maternal grandparents was not an appropriate place for the children to be placed because a child had previously been removed from their home following abuse and neglect allegations, and the grandparents were unable to make the changes needed to regain custody.
Accordingly, we find Mothers treatment plan reasonable, and the family court did not err in terminating her parental rights for failing to complete the treatment plan.[4]  

 B.  Best Interests of the Children

Mother also alleges the court erred in finding termination of her parental rights was in the minor childrens best interests.  She generally speculates the termination could be proved to be very harmful to the children and is the equivalent of killing the mother whom they presumably love and share a bond.  Without questioning Mothers love for her children, we find the record includes ample evidence to support the family courts finding that terminating her parental rights is in her minor childrens best interests.  In addition to the recommendations of her DSS counselor and the childrens guardian ad litem, we find it clear from the record that Mother is not capable of providing the level of care needed by the children.  Their foster mother of three years undisputedly provided the level of care they needed, and testimony shows they have bonded with her and respond more positively to her parenting.  The evidentiary record demonstrates that the family court did not err in terminating Mothers parental rights.
II.  Fathers Appeal
Father argues the family court erred in terminating his parental rights on the grounds that (1) he failed to remedy conditions that led to their removal, (2) failed to support the children, (3) had a diagnosable condition that prevented him from providing minimally acceptable care to the children, and that was not likely to change within a reasonable period of time; and (4) the children had been in DSS foster care custody for at least fifteen of the preceding twenty-two months.  He does not dispute the courts finding that terminating his parental rights is in the best of interests of his minor children.

A.  Failure to Remedy 

Father contends the childrens removal was predicated on factors that occurred while he was incarcerated, to wit:  the condition of the family residence and physical neglect of the minor children.  Father maintains that after he was released, he made necessary repairs to the residence and substantially completed other aspects of his treatment plan.  Consequently, Father argues the family court erred in terminating his parental rights for failing to remedy conditions that led to their removal.  We disagree.   
It is undisputed that Father complied with his treatment plan to the extent he maintained stable employment and made necessary physical repairs and improvements to the family residence.  However, the treatment plan also required parent effectiveness classes, negative results on random drug and alcohol screenings, and counseling to address issues related to Fathers diagnosed conditions of drug abuse and antisocial personality disorder.  Father concedes he ceased all required counseling shortly after testing positive for cocaine use in a hair follicle test and being charged with DUI in December 2004, but argues he substantially completed the counseling components of his treatment plan.  We do not find this argument compelling.  In particular, we note Dr. Noelker described the treatment plan recommendations as basically minimum recommendations that would be required in order to consider reunification of Father with his minor children.  Although Father made progress in many aspects of his treatment plan, he clearly relapsed in December 2004 and essentially abandoned his treatment plan from that time forward.

B.  Failure to Support 

Father maintains the family court erred in terminating his parental rights on the basis that he failed to support his children, because he was never ordered to pay child support, but nevertheless made a material contribution to the children by providing in-kind support of gifts, meals, clothing, money, and entertainment.  We disagree.
As an initial matter, it is not clear from the order that the family court terminated Fathers grounds on this basis.   In paragraph fifteen of its order, the family court provided:

The Defendant minor children have been harmed as defined in S.C. Code Ann. § 20-7-490[(2)](c) in that [Father] failed to supply adequate food, clothing, shelter, education, supervision, or health care though financially able to do so or offered financial or other reasonable means to do so, and because of the severity or repetition of the neglect, it is not reasonably likely that the home can be made safe within twelve (12) months. 

(Emphasis added).  This language suggests the court is terminating Fathers parental rights under section 20-7-490(1) of the South Carolina Code, which provides for TPR where a child has been neglected, and because of the severity or repetition of the neglect, the court deems it reasonably unlikely that the home can be made safe within twelve months.  However, paragraph fifteen concludes with a specific reference to section 20-7-1572(4) of the South Carolina Code, which provides grounds for termination for willful failure to provide material support to ones child.  S.C. Code Ann. § 20-7-1572(4) (Supp. 2005). Also, the neglect referenced by the family court largely related to support issues, such as providing food, clothing, and shelter.
 Regardless, we find the family court properly granted TPR on either basis, both of which were raised in DSSs pleadings.  First, Father does not specifically dispute the family courts order that his failure to provide adequate food, clothing, shelter, education, supervision, or health care constituted neglect.  Thus, it is the law of the case.  See Hooper v. Rockwell, 334 S.C. 281, 300, 513 S.E.2d 358, 369 (Ct. App. 1999) (stating in TPR action an unchallenged ruling by the family court becomes law of the case).  Instead, Father focuses his argument on whether the contributions he made to the children rise to the level of a material contribution sufficient to overcome TPR under section 20-7-1572(4).  
 A material contribution is defined as either financial contributions according to the parents means or contributions of food, clothing, shelter, or other necessities for the care of the child according to the parents means.  S.C. Code Ann. § 20-7-1572(4).  Toys are not included in this definition and will not be considered by us in concluding whether Appellant made a material contribution to Children.  S.C. Dept of Soc. Servs. v. Seegars, 367 S.C. 623, 630, 627 S.E.2d 718, 722 (2006).  Here, the record indicates Father was gainfully employed but at most only occasionally provided the children meals and gave them games and little nick nack stuff.  The record includes no evidence that Father provided clothing or other necessities to the children during their stay in DSS custody, except for Fathers testimony that he had sporadically given the foster parent money for the children.  However, Father testified that, at the time of the hearing, he had not really financially [been] contributing to the children because he was making repairs to his house, which had been damaged by a kitchen fire.  He also admitted having recently purchased end tables, lamps, and a new leather set of furniture for his home.  Based on the forgoing evidence, we find Father had the means to make a material contribution to his children but willfully failed to provide such support.

C.  Diagnosable Condition 

Father argues the family court erred in terminating his parental rights on the basis that he had a diagnosable condition that rendered him unable to provide minimally acceptable care for his minor children, and that the condition was unlikely to change in a reasonable period of time.  We disagree.
Dr. Noelker diagnosed Father as being drug dependent and having an antisocial personality disorder, and opined both conditions rendered him incapable of providing minimally adequate care to his minor children.  The family court subsequently approved a treatment plan based on what Dr. Noelker described as basically minimum recommendations that would be required to consider reunification.  Father does not dispute his failure to successfully complete the entire treatment program.  Instead, he argues he completed necessary repairs to the family residence and otherwise substantially completed the program.  He focuses his argument primarily on drug screenings, arguing the great majority of his test results were negative or questionable.  However, he does not dispute testing positive for cocaine use in a hair follicle test in December 2004, testing positive for alcohol use as late as September 2004, and driving under the influence of alcohol in December 2004.  Additionally, we note Father stated at the hearing that he was an addict and admitted using cocaine more than two years after the children were removed from the home.  Father admittedly, voluntarily discontinued his counseling in December 2004, with the exception of attending one or two counseling sessions between that time and the TPR hearing.
Based on the record, and in particular Fathers testimony, we find while he might have initially made progress in his treatment plans drug counseling provisions, he clearly had a relapse in December 2004 and subsequently stopped attending drug court and engaging in counseling.  Accordingly, we find the family court did not err in terminating Fathers parental rights for having a diagnosable condition not likely to change in a reasonable period of time.

D.  Duration of DSS Foster Care Custody 

Fathers final argument alleges the family court erred in terminating his parental rights on the ground that his minor children had been in foster care for at least fifteen of the preceding twenty-two months, as permitted by section 20-7-1572(8) of the South Carolina Code.  We disagree.
Father does not dispute that his minor children had been in DSS foster care for at least fifteen of the twenty-two months preceding the TPR hearing in August 2005.  Instead, he argues physical custody of the children was resumed by DSS in June 2004 because of circumstances over which he had no control:  his stabbing and subsequent hospitalization that removed him from the home and left the children alone in Mothers care.  But for this unfortunate event, Father speculates the children would have likely remained in the home and DSS involvement would not have continued for a period sufficient to provide a basis for termination under section 20-7-1572(8).  We find this argument unavailing.
The record indicates the family court based the February 2004 physical reunification of the children and parents on the strength of Fathers parenting abilities and because he was the childrens primary caretaker.  Among other things, the family court prohibited the parents from allowing Mother to care for the children alone, and conditioned their return on Fathers availability to care for the children.  Although obviously aware of the importance of being available to care for his children, Father voluntarily exposed himself to potential physical harm by breaking up a bar fight and later socializing with one of the people who had engaged in the fight.  Father was not merely a hapless stabbing victim, but instead exercised poor judgment and placed himself in harms way.  Thus, we find the unfortunate circumstances that resulted in Fathers hospitalization, and his childrens consequential return to foster care, were substantially within Fathers control.  Moreover, we note the record indicates DSS regained physical custody of the children with Fathers consent after he was hospitalized and left only Mother to care for them.   
CONCLUSION
For the foregoing reasons, we find the family court did not err in terminating Mothers and Fathers parental rights to their respective minor children.  Accordingly, the decision of the family court is
AFFIRMED.
 ANDERSON, HUFF, and SHORT, JJ., concur.

[1]  Mother and Father brought separate appeals, which this court consolidated in October 2005.  
[2]  We decide this case without oral argument pursuant to Rule 215, SCACR.
[3]  The family court also terminated John Does parental rights, but that portion of the courts order is not a subject of this appeal.
[4]  We also note Mother does not dispute the family courts finding that she failed to complete portions of her treatment plan that did not require assistance from a third party in rearing her children, including drug court, drug and alcohol counseling, anger management counseling, and her psychiatric drug regimen.  Furthermore, she does not dispute the family courts termination of her parental rights on other grounds.