639 S.E.2d 165

**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,**

v.

**Richard ROE, Jane Doe, John Doe, and Matthew B. (DOB: 05/30/02), Defendants,**

**of whom Jane Doe is Appellant.**

**No. 4191.**

Court of Appeals of South Carolina.

Submitted Dec. 1, 2006.

Decided Dec. 21, 2006.

452

Charles R. Griffin, Jr., of Anderson, for Appellant.

Kimberly Welchel, of Walhalla, for Respondents.

Blair L. Stoudemire, of Seneca, for Guardian Ad Litem.

ANDERSON, J.:

The South Carolina Department of Social Services (DSS) initiated this termination of parental rights action against Richard, Roe, John Doe, and Jane Doe. The family court terminated Jane Doe's parental rights on the grounds: (1) she

has a diagnosable condition not likely to change within a reasonable time that makes her unlikely to provide minimally acceptable care for the child and (2) termination of her parental rights is in the child's best interest.[1] We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Doe gave birth to the minor child Matthew on May 30, 2002, after twenty-four (24) weeks of gestation.[2] Matthew was placed in foster care in Georgia until November of 2003, when he was returned to Doe. In April 2004, DSS took Matthew into custody as the result of allegations of neglect and violence in the family home, including the possibility of physical abuse.

Shortly after Matthew's birth, Doe was referred to psychologist Fred W. Fussell for evaluation because of hospital personnel's concern regarding her parenting ability. Background information revealed that Doe receives a monthly Supplemental Security Income check and has never been married or employed. She graduated from a special education curriculum at Stephens County High School. Doe's parents divorced when she was nine. Since then her home has been with her mother. Her mother's boyfriend lives in the home as well.

After Matthew was removed from Doe's custody in April 2004, Doe was evaluated by psychologist David G. Cannon. Subsequently, through the Oconee Department of Disabilities and Special Needs, Doe participated in counseling and parenting classes as part of a treatment plan.

DSS instituted this action to terminate Doe's parental rights pursuant to section 20–7–766 of the South Carolina Code

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

2. Defendant Richard Roe, Matthew's putative father, reportedly takes no role in Matthew's life. Roe was served by publication but did not file a responsive pleading. Consequently, the family court held Roe in default and terminated Roe's parental rights based on finding clear and convincing evidence of (1) willful failure to support or make a material contribution to the minor child's care as provided in S.C.Code Ann. § 20–7–1572(4) (1976), (2) willful failure to visit the minor child within the last six months pursuant to S.C.Code Ann. § 20–7–1572(3) (1976), and (3) the termination of Roe's parental rights would be in the best interest of the minor child.

(Supp.1996, amended 1997). By order dated July 2, 2005, the family court announced, *inter alia*, the following findings of fact:

(9) I find that [DSS] has proven by clear and convincing evidence and unchallenged expert psychological testimony that Defendant [Jane Doe] has a diagnosable condition of Personality Disorder NOS [not otherwise specified] with Antisocial Traits, Mild Mental Retardation, and Borderline Intellectual Functioning unlikely to change within a reasonable time and the condition makes the Defendant unlikely to provide minimally acceptable care for the child pursuant to S.C.Code Ann. § 20-7-1572(6).

(14) I find it to be in the best interest of the Defendant child for the parental rights of Defendant [Jane Doe] to be terminated. The minor child has excelled in his present placement pursuant to testimony provided in that he talks constantly, knows his animal sounds, loves to play outside, eats a wide variety of foods and is potty trained. The Guardian ad Litem states that termination of parental rights is in the child's best interest.

## STANDARD OF REVIEW

In a termination of parental rights (TPR) action, the best interest of the child is the paramount consideration. *Doe v. Baby Boy Roe*, 353 S.C. 576, 579, 578 S.E.2d 733, 735 (Ct.App.2003). Before parental rights can be forever terminated, the alleged grounds for the termination must be proven by clear and convincing evidence. *Richberg v. Dawson*, 278 S.C. 356, 357, 296 S.E.2d 338, 339 (1982); *S.C. Dep't of Soc. Servs. v. Parker*, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct.App.1999). On appeal, this court may review the record and make its own determination as to whether the grounds for termination are supported by clear and convincing evidence. *S.C. Dep't of Soc. Servs. v. Cummings*, 345 S.C. 288, 293, 547 S.E.2d 506, 509 (Ct.App.2001). However, in reviewing a termination of parental rights, an appellate court is not required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *S.C. Dep't of Soc. Servs. v. Seegars*, 367 S.C. 623, 629, 627 S.E.2d 718, 721 (2006); *Dorchester County Dep't of Soc. Servs. v. Miller*, 324

S.C. 445, 452, 477 S.E.2d 476, 480 (Ct.App.1996). "While we have jurisdiction in such matters to find facts based on our own view of the preponderance of the evidence, where the evidence presented in the record adequately supports the findings of the trial judge, due deference should be given to his judgment based on his superior position in weighing such evidence. This is especially true in cases involving the welfare and best interests of children." *Aiken County Dep't of Soc. Servs. v. Wilcox*, 304 S.C. 90, 93, 403 S.E.2d 142, 144 (Ct.App. 1991) (citations omitted). Because terminating the legal relationship between natural parents and a child is one of the most difficult issues an appellate court has to decide, great caution must be exercised in reviewing termination proceedings and termination is proper only when the evidence clearly and convincingly mandates such a result. *S.C. Dep't of Soc. Servs. v. Cochran*, 364 S.C. 621, 626, 614 S.E.2d 642, 645 (2005).

## *LAW/ANALYSIS*

■ Doe contends that, although DSS may have shown she has a diagnosable condition, the condition can be remedied. She argues the family court erred in finding clear and convincing evidence that her parental rights should be terminated, because DSS failed to prove a diagnosable condition not likely to change within a reasonable time. We disagree.

■ Termination of parental rights statutes must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and control of their parents by terminating the parent-child relationship. *Parker*, 336 S.C. at 258, 519 S.E.2d at 356 (*citing* S.C.Code Ann. § 20–7–1578 (Supp.1998)). The interests of the child shall prevail if the child's interest and the parental rights conflict. *Id.* The family court may order the termination of parental rights upon a finding that one or more of the nine statutory grounds is met *and* a finding that termination is in the best interest of the child. *Seegars*, 367 S.C. at 629, 627 S.E.2d at 721; S.C.Code Ann. § 20–7–1572 (Supp.2005) (emphasis added). Subsection (6) provides for termination upon clear and convincing evidence that:

[t]he parent has a diagnosable condition unlikely to change within a reasonable time including, but not limited to,

alcohol or drug addiction, mental deficiency, mental illness, or extreme physical incapacity, and the condition makes the parent unlikely to provide minimally acceptable care of the child. . . .

S.C.Code Ann. § 20–7–1572(6) (Supp.2005).

When the diagnosable condition alleged is mental deficiency, there must be clear and convincing evidence that: (1) the parent has a diagnosed mental deficiency, and (2) this deficiency makes it unlikely that the parent will be able to provide minimally acceptable care of the child. *S.C. Dep't of Soc. Servs. v. Smith*, 311 S.C. 426, 428, 429 S.E.2d 807, 808 (1993); *Orangeburg County Dep't of Soc. Servs. v. Harley*, 302 S.C. 64, 66, 393 S.E.2d 597, 598 (Ct.App.1990). We have determined that testimony by a clinical psychologist provided clear and convincing evidence of a diagnosable condition of mental deficiency, unlikely to change within reasonable time, and that condition made the mother unlikely to provide minimally acceptable care of her child. *S.C. Dep't of Soc. Servs. v. Humphreys*, 297 S.C. 118, 122, 374 S.E.2d 922, 925 (Ct.App. 1988). In *Humphreys*, as in the instant case, the mother was mildly mentally deficient and the psychologist opined there was little likelihood that a course in parenting skills could ever make her capable of being primary caretaker for her child. *Id.* Distinguishing *Humphreys*, in *Smith*, 311 S.C. at 426, 429 S.E.2d at 807, our Supreme Court reversed the family court's termination of parental rights based on section 20–7–1572(6). Both parents in *Smith* were mildly mentally retarded and expert psychological testimony indicated the mother's ability to function in a parental role was poor and unlikely to improve. *Id.* at 428, 429 S.E.2d at 808. On cross examination, however, the psychologist opined the parents could possibly benefit from a new and innovative program for the education of the mentally retarded focusing on parenting skills, family planning, and sexuality. *Id.* at 429, 429 S.E.2d at 809. The DSS social worker along with the administrator of the educational program agreed, and the Court reversed, remanding the case to the family court for reconsideration of termination following the parents' participation in the program.

Our precedent has traditionally distinguished between the provisions under section 20–7–1572(2) and section 20–7–1572(6) as to the remediation of conditions that lead to a TPR

action. *See Harley,* 302 S.C. at 66, 393 S.E.2d at 598; *Humphreys,* 297 S.C. at 122, 374 S.E.2d at 924–25. Subsection (2) provides that parental rights may be terminated if "[t]he child has been removed from the parent pursuant to Section 20–7–610 or Section 20–7–736, has been out of the home for a period of six months following the adoption of a placement plan by court order or by agreement between the department and the parent, *and the parent has not remedied the conditions which caused the removal....*" S.C.Code Ann. § 20–7–1572(2) (Supp.2005) (emphasis added). On the other hand, section 20–7–1572(6) does not expressly provide an opportunity to remedy a diagnosed condition that is "unlikely to change within a reasonable time." *Id.,* § 20–7–1572(6). However, as *Smith* inculcates, even though a diagnosis of mental retardation is unlikely to change, a parent's ability to provide minimally acceptable care for the child may nevertheless improve with specialized training.

While *Smith* offers some support for Does' contention that the unfortunate consequences of her diagnosed condition may be remedied, the standard by which the court must evaluate her claim remains the same. The family court must find by clear and convincing evidence that Doe has a mental deficiency, unlikely to change, that makes it unlikely she can provide minimally acceptable care for Matthew and that termination of Doe's parental rights are in Matthew's best interest.

## I. Diagnosable Condition

### A. Expert Testimony

Dr. Fussell's assessment was based on results from the Wechsler Intelligence Adult Scale–III, the Minnesota Multiphasic Personality Inventory–2, the Rorschach Psychodiagnostic Plates, the Bender–Gestalt Visual Motor Test, the Parent–Child Relationship Inventory, Projective Drawings, Clinical Interview, and Informant Interview. Doe's cognitive test results fell within the borderline range of intellectual functioning, with a Full Scale I.Q. score of 71. On the objective personality instruments Doe's results were appreciably defensive, requiring re-administration, but ultimately remaining defensive. Dr. Fussell's diagnostic impression was Axis II: Borderline Intellectual Functioning and Personality Disorder,

NOS (not otherwise specified) (Cluster A Traits), Axis IV: Problems with Primary Support Group, Custody Issues, and Axis V: GAF = 35 (Current).

At the termination hearing Dr. Fussell addressed Doe's parenting ability in light of his findings. Questioned by DSS's attorney about the meaning of "personality disorder not otherwise specified," Dr. Fussell explicated:

A. Well, the personality disorders are—there's nine of them, and they're grouped into three clusters. The first cluster is composed of perceptional distortions, peculiar behavior. Cluster B, the second cluster, is composed of antisocial behaviors, borderline, behavioral aberrations, and Cluster C is dependent sorts of characteristics, and Cluster A is made up of paranoid, schizoid, and schizotypal and I'd see her [Doe] as mostly schizoid with some paranoid aspects.

Q. So, if you can describe that diagnosis of personality disorder not otherwise specified, Cluster A trait.

A. Interpersonal deficits, suspicious, untrusting, mild issues with perceptual accuracy.

Q. Okay, and you also diagnosed her as borderline intellectual functioning. Describe that.

A. Well, it's a classification below low average and above mild mental retardation. In her case she was just above the mild mental retardation. So, it's significantly below average.

Q. And on Axis V your diagnostic impression was a GAF of 35. What does that entail?

A. Someone with a GAF of 35 is going to experience significant difficulties interacting successfully with the environment, and be a number of issues present, misinterpret others, misrepresent issues.

Q. And based on your history, your interview and your testing what are your conclusions and recommendations regarding [Doe].

A. Well, at the time I performed this assessment I had considerable concern regarding her ability to care for a child, particularly one who is premature at that point, and in terms of recommendations I was not very optimistic.

Q. Okay, and what treatment or therapy would you recommend or did you recommend for [Doe]?

A. Well, at the time of assessment I did not recommend one.

Q. And is there a reason for that?

A. I didn't have much optimism it would be successful.

Q. And why did you not have much optimism that it would be successful?

A. The personality characteristics compounded by intellectual ability.

Q. And how does that work to make it to where she would not be a good ... candidate for further counseling or treatment?

A. Well, the degree of suspiciousness she's going to have marked difficulty trusting someone enough to let them know what's happening and accept their guidance and direction, and that's further compounded by intellectual limitations as she would have difficulty understanding what's being said.

. . .

Q. And do you have an opinion as to a reasonable degree of certainty within the area of your expertise as [Doe's] ability to provide minimally acceptable care for this child at the time you saw and evaluated her?

A. I felt she did not have the ability to do that.

Q. Now, based on your observations, is it reasonably likely that this condition could be remedied in a reasonable period of time at the time you saw her?

A. No.

In June of 2004, when Matthew was again in DSS custody, psychologist David G. Cannon evaluated Doe. Dr. Cannon administered the Wechsler Adult Intelligence Scale–Revised and the Wide–Range Achievement Test–Revised, which yielded a Full Scale I.Q. score of 69, indicating Doe's intellectual functioning was in the mild range of mental retardation. At this level Dr. Cannon opined Doe should be able to master basic academic skills up to a seventh or eighth grade level. Dr. Cannon's diagnostic impressions were in accord with Dr. Fussell's. He confirmed the Axis II diagnosis of Personality

Disorder NOS with Antisocial Traits. In addition, Dr. Cannon indicated an Axis I diagnosis of Neglect of Child and Rule/Out Physical Abuse of Child.

Summarizing his impressions of Doe's psychological status in his report, Dr. Cannon opined she appeared to be "heavily into denial," "manipulative and self-contradictory in her responses," and "should not be regarded as a credible respondent." Dr. Cannon cautioned, "[i]t seems unlikely that she will cooperate in any genuine manner with a rehabilitative program. She seems to possess few personal qualities at this time that would enable her to function as an effective parent." Dr. Cannon recommended Doe be required to successfully complete classes in parenting and anger management and be required to enter individual psychotherapy.

At the termination hearing Dr. Cannon testified that, in addition to his earlier assessment, he reviewed Dr. Fussell's psychological evaluation prior to the termination hearing:

Q. And were [Dr. Fussell's] diagnostic impressions on that psychological evaluation consistent with your findings two years later.

A. Yes, they were very similar.

Q. And were the treatment recommendations as indicated in your evaluation consistent with the treatment recommendations recommended at that time?

A. As I recall Dr. Fussell in his report didn't make specific recommendations. He noted as I noted in effect that the probability of change and successful intervention was very low, and his prognosis as indicated in the latter part of his report was quite poor.

Q. And after preparing your psychological evaluation and then reviewing that one, what effect did that have on your opinion regarding the chronicity of this condition and the parent's ability to provide minimally acceptable care for that child.

A. Well, unfortunately it reinforce[s] my impressions that the prognosis here is quite poor. There did not appear to be any appreciable gain or change in what was close to or going on a two-year period from the time he conducted his evaluation up to the time that I conduct-

ed mine, and that reinforced my impression that there was very little—there is very little probability of meaningful change on this lady's part.

## B. Lay Testimony[3]

Kathy Baker,[4] an employee with Oconee County Department of Disabilities and Special Needs, testified she met with Doe to create a treatment plan. Implementation of the plan began on August 13, 2004, after DSS had taken custody of Matthew. According to Baker, Doe "learned how to learn resources into the community, like libraries or paying bills and interacting with anything in the community, living skills." Baker commented that Doe "done great" in the program. She observed Doe's interactions with children and noted that Doe "would just light up" when she was around children.

Doe testified she liked working with the Disabilities and Special Needs program. When asked what they do, she responded, "[g]o to the movies, they carry me to pay bills and grocery shopping and stuff." Doe claimed she had done everything DSS asked her to do; she attended parenting classes and earned a certificate, but she could not attend anger management classes because she could not afford them. She averred she planned to continue working with Disabilities and Special Needs.

Doe maintained she visited Matthew regularly and the only visit she missed was one DSS cancelled. According to Doe, the visits were coordinated by Disabilities and Special Needs personnel, and Doe used a taxi for transportation to the visits at a cost of twenty-five dollars per trip. She explained that during her visits with Matthew she played with him, read him books, and brought him snacks. Doe professed she had hot

---

3. The record lists Lori Sanders, Human Service Specialist for Oconee DSS, as a witness for Respondent DSS; Lynn Baker from Disabilities and Special Needs and Doe's Mother were listed as witnesses for Appellant Doe. Testimony from these witnesses, if they in fact did testify at the termination hearing, is not included in the record on appeal.

4. Baker, a high school graduate, did not testify as an expert witness, and the record contains no specific information on her professional qualifications.

water and a stove in her home and could cook "different things" like "spaghetti."

We agree with the family court's conclusion that clear and convincing evidence exists in the expert medical testimony to support termination of Doe's parental rights. Both psychologists confirmed Doe's diagnosed intellectual deficits and personality disorder, and both agreed the conditions were unlikely to change. In fact, no appreciable differences in Doe's condition were observed between the initial evaluation by Dr. Fussel and the assessment two years later by Dr. Cannon. In his report Dr. Fussel opined:

> [t]his assessment is indicative of a marginal individual, both intellectually and as regards to her personality organization. Such individuals are often unable to provide an adequate environment for an infant or other child. They are largely unaware or oblivious to the needs of others. Consequently, a significant potential for neglect exists.

Dr. Cannon subsequently explained Doe "seems totally lacking in judgment and insight" and "she did not present as a credible respondent." He noted "[i]t seems unlikely that she will cooperate in any genuine manner with a rehabilitative program. She seems to possess few personal qualities at this time that would enable her to function as an effective parent."

Dr. Fussell cautioned that, because he did not observe Doe's interaction with Matthew, his clinical impressions should be corroborated by independent observation. Accordingly, the Guardian ad Litem appointed in this case stated that termination of Doe's parental rights was in Matthew's best interest.

Finally, in contrast to the circumstances in *Smith,* no convincing evidence indicates the treatment available to Doe through Oconee County Disabilities and Special Needs offers the kind of specialized remediation that would enable Doe to provide minimally acceptable care for Matthew.

## II. Best Interests of the Child

Doe does not challenge the family court's finding that terminating her parental rights is in the best interest of the child. We, nevertheless, review the family court's conclusion *ex mero motu.*

 An exception to the rule that an unpreserved issue will not be considered on appeal exists where the interests of minors or incompetents are involved. *State v. Passmore,* 363 S.C. 568, 611 S.E.2d 273 (Ct.App.2005). Procedural rules are subservient to the court's duty to zealously guard the rights of minors. *Ex Parte Morris,* 367 S.C. 56, 624 S.E.2d 649 (2006); *Joiner v. Rivas,* 342 S.C. 102, 536 S.E.2d 372 (2000). Where the rights and best interests of a minor child are concerned, the court may appropriately raise, *ex mero motu,* issues not raised by the parties. *Ex parte Roper,* 254 S.C. 558, 176 S.E.2d 175 (1970). *See also Arscott v. Bacon,* 351 S.C. 44, 567 S.E.2d 898 (Ct.App.2002) (due to role of courts in protecting minors, the appellate court may raise *ex mero motu* issues not raised by the parties). The duty to protect the rights of minors and incompetents has precedence over procedural rules otherwise limiting the scope of review and matters affecting the rights of minors can be considered by this court *ex mero motu. Galloway v. Galloway,* 249 S.C. 157, 153 S.E.2d 326 (1967); *Caughman v. Caughman,* 247 S.C. 104, 146 S.E.2d 93 (1965). *See also S.C. Dep't of Soc. Servs. v. Basnight,* 346 S.C. 241, 551 S.E.2d 274 (Ct.App.2001) (under South Carolina's public policy, the best interests of minor children prevail over procedural impediments to obtaining support for minor children).

Here, the family court found that Matthew has excelled in his present placement pursuant to testimony provided in that he "talks constantly, knows his animal sounds, loves to play outside, eats a wide variety of foods and is potty trained." In addition, the Guardian ad Litem advised that termination was in Matthew's best interest. The evidentiary record taken as a whole, including lay testimony, expert testimony, psychological reports, and the Guardian ad Litem's recommendation convinces us that Doe is not capable of providing the level of care Matthew needs and termination of Doe's parental rights is in his best interest.

## CONCLUSION

After analyzing the facts, applicable statutory provisions, and relevant precedent with specificity, we place our imprimatur upon the ruling of the family court.

Accordingly, the family court's order is

**AFFIRMED.**

HUFF and WILLIAMS, JJ., concur.