354 S.C. 602 (2003)
582 S.E.2d 419
SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,
v.
Robin HEADDEN, Robert Gandy and Tabitha Gandy, 06-20-88, Defendants, and
John Doe and Mary Doe, Third Party Intervenors, of whom Robin Headden is Appellant.
No. 25665.
Supreme Court of South Carolina.
Heard March 19, 2003.
Decided June 12, 2003.
*604 Laree Anne Hensley, of North Charleston, for Appellant.
Thomas P. Stoney, II, of Cordesville, for Respondent.
Wolfgang L. Kelly, of Summerville, for Guardian Ad Litem.
*605 Chief Justice TOAL:
Robin Headden ("Mother") appeals from the family court's termination of her parental rights to her daughter, ("Child").[1]

FACTUAL/PROCEDURAL BACKGROUND
The Child was taken into emergency protective custody by law enforcement on June 23, 1996, when she was 8 years old. The police arrived at the Mother's trailer and observed the Mother intoxicated and throwing clothes and other items out of the house through a door and a broken window. Mother testified that she was throwing out her roommate's belongings because her roommate had failed to pay rent or bills for several months, and that she broke the window accidentally in the process. The Mother was also accused of destroying furniture with a knife, but she denied cutting the furniture and blamed this on her ex-boyfriend. When the police arrived, the Child returned home from a neighbor's house and was taken into protective custody based on threat of harm. Custody of the Child was transferred to Respondent, South Carolina Department of Social Services ("DSS").
The family court found probable cause existed for the Child's removal at the 10 day hearing on July 2, 1996, and ordered that she remain in DSS's custody. The family court held a merits hearing on September 18, 1996, and found that the Child was physically neglected as defined by S.C.Code Ann. § 20-7-490, ordered the Child remain in DSS's custody, and adopted a treatment plan for the Mother.[2] From June of 1996 through December 1996, the Mother coordinated visitation with the Child through DSS. A Judicial Review hearing was held on December 19, 1996. In addition to holding that all previous orders remained in full force and effect, the court *606 ordered the Mother to pay child support in the amount of $51.50 per month beginning January 1, 1997. In December, the Mother decided to move to Memphis, Tennessee, apparently after receiving a job offer there and after speaking with the Child's DSS case manager at the time, Susan Kellar.[3]
The Mother arrived in Memphis on a Greyhound bus on Christmas Day 1996, but did not begin working at her intended job until April of 1997, apparently due to delays in construction. From January to April, the Mother testified she held several temporary jobs. The Mother testified that she had difficulty locating the appropriate agencies in Tennessee that could assist her in completing her treatment plan, and went through a period of heavy drug and alcohol use beginning in late June 1997. She testified that she was spending as much as $600 per week on drugs (crack cocaine) in July 1997. On August 12, 1997, the Mother entered Grace House, an inpatient drug and alcohol rehabilitation center in Memphis. The Mother remained at Grace House until she successfully completed the program in February 1998.
Although the Mother was making child support payments through May 1997, she ceased making payments in June 1997 and did not resume payments until April 1998. The Mother claims she believed her parental rights were terminated in the Fall of 1997, and regardless that she could not pay support while living at Grace House because she was not allowed to work. She based her belief that her parental rights had been terminated on the Order for Permanency Planning she received in September 1997 and on a subsequent comment by her attorney's receptionist that her attorney was no longer involved in the case. All of this occurred while Mother was a patient at Grace House and could not travel to South Carolina. The Mother claims she made numerous calls to DSS that were not returned during this time. However, the DSS case manager *607 assigned to the Child, Romona Keitt, testified that the Mother called her from Grace House once in December 1997.[4]
Ms. Keitt stated that she and the Mother spoke about sending Christmas presents to the Child and that the Mother gave her a new mailing address on Candlelight Drive in Tennessee. The Mother did not give Ms. Keitt the address at Grace House, but she did tell Ms. Keitt that she was in a fulltime treatment center. Ms. Keitt testified that the next call she received from the Mother was in September of 1999, 18 months later. In the intervening months, Ms. Keitt testified that she sent certified letters to the Mother at Candlelight Drive address the Mother gave her, but that the letters were returned to her.[5]
After completion of the program at Grace House, the Mother moved to Arkansas temporarily for work on a construction project and then returned to Memphis. The Mother made several child support payments beginning in April 1998, but ceased payments again in July 1998 until October 1999, 16 months later, when she was served with notice that DSS was pursuing termination of her parental rights ("TPR").
The Family Court appointed counsel to represent Mother in the TPR action upon Mother's request. DSS voluntarily nonsuited its case due to defects in pleadings and service in June 2000. Before DSS re-filed, the Mother's motion for visitation, to be supervised by the Child's therapist, was granted. The Child's therapist, Dr. McClain, refused to participate and the Mother was forced to locate another professional to determine whether visitation would be in the best interest of the child. Dr. Geddes at MUSC performed an evaluation of the Mother and the Child and recommended that supervised visitation be allowed. DSS refused to allow Dr. Geddes to supervise. *608 After filing a Rule to Show Cause, the Mother was permitted visitation with the Child supervised by Dr. McClain.[6]
The TPR hearing took place on November 28 and 29 of 2000. The family court granted TPR based on willful failure to support, willful failure to visit, and because the Child had been in foster care for 15 of the most recent 22 months, all pursuant to S.C.Code Ann. § 20-7-1572 (Supp.2000). The Mother raises the following issues on appeal:
I. Did the Family Court err in finding that clear and convincing evidence supported the finding that the Mother willfully failed to visit and support the Child under S.C.Code Ann. § 20-7-1572(3) and (4) (Supp. 2000)?
II. Is TPR justified based solely on a finding that a child has been in foster care for 15 of the last 22 months under S.C.Code Ann. § 20-7-1572(8) (Supp.2000)?

LAW/ANALYSIS
The Mother's parental rights were terminated pursuant to three different statutory grounds. S.C.Code Ann. § 20-7-1572(3), (4), and (8).[7]
The South Carolina Code mandates that the TPR statutes "must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and control of their parents by terminating the parent-child relationship." S.C.Code Ann. § 20-7-1578 (Supp. 2000); see Joiner v. Rivas, 342 S.C. 102, 536 S.E.2d 372 (2000) (overruling prior cases calling for strict construction of the TPR statutes). In addition, "[t]he interests of the child shall prevail if the child's interest and the parental rights conflict." S.C.Code Ann. § 20-7-1578. Grounds for termination of parental rights must be proven by clear and convincing evidence. *609 Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Richland County DSS v. Earles, 330 S.C. 24, 496 S.E.2d 864 (1998).
Upon review, the appellate court may make its own finding from the record as to whether clear and convincing evidence supports the termination. South Carolina DSS v. Brown, 317 S.C. 332, 454 S.E.2d 335 (Ct.App.1995). The reviewing court, however, is not required "to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony." Hooper v. Rockwell, 334 S.C. 281, 297, 513 S.E.2d 358, 367 (1999).

I.
The Mother argues that the family court erred in finding that DSS had proven by clear and convincing evidence that she willfully failed to visit and support the Child as defined in S.C.Code Ann. § 20-7-1572(3) and (4). We disagree.

A. Failure to Visit
The family court may order TPR upon a finding of one of several statutory grounds and a finding that termination would be in the best interest of the child. S.C.Code Ann. § 20-7-1572 (Supp.2000). Section 20-7-1572(3) provides that the family court may terminate if it is in the best interest of the child and if
[t]he child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to visit the child. The Court may attach little or no weight to incidental visitations, but it must be shown that the parent was not prevented from visiting by the party having custody or by court order. The distance of the child's placement from the parent's home must be taken into consideration when determining the ability to visit.
S.C.Code Ann. § 20-7-1572(3) (emphasis added).
It is undisputed that the Child has "lived outside the home of either parent" for much longer than six months as she has been in DSS's custody since June 1996.[8] The question before *610 the family court then was whether the Mother's failure to visit the Child between 1996 and 2000 was wilful.
Whether a parent's failure to visit is "wilful" is a question of intent to be determined from the facts and circumstances of each individual case. SCDSS v. Broome, 307 S.C. 48, 413 S.E.2d 835 (1992). "Parental conduct which evinces a settled purpose to forego parental duties may be characterized as `wilful' because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent." Broome, 307 S.C. at 53, 413 S.E.2d at 838. The trial judge is given wide discretion in making this determination. Id.
As discussed, the Child in this case was removed from the Mother's home in June 1996. The record indicates that Mother visited the Child from June until November or December 1996.[9] On Christmas Day 1996, the Mother moved to Memphis, Tennessee without making much, if any, progress on her treatment plan. The Mother lived in Memphis for seven full months before entering Grace House. The record reflects that the Mother sent only one letter, in February 1997, to the Child during this time. There is no indication that the Mother attempted to call the Child or otherwise stay in touch with her. The Mother did travel back to South Carolina for a hearing in June 1997. The hearing was continued and the Mother claims she was denied visitation when she returned for that hearing.
The Mother's visitation was officially terminated in the Order for Permanency Planning issued following a hearing in September 1997, which the Mother was unable to attend because she was living at Grace House. This Order states that Mother had failed to complete any of her treatment plan, had moved to Tennessee, and had not returned to visit the Child. When Mother was released from Grace House upon *611 successful completion of the program in February 1998, she did not contact DSS or her Child.
Although the Mother did return to South Carolina and sought reinstatement of visitation rights after she received the notice of TPR in the Fall of 1999, her action came too late. The family court is not limited to considering the months immediately preceding TPR in determining whether a parent has wilfully failed to visit. See Abercrombie v. LaBoon, 290 S.C. 35, 348 S.E.2d 170 (1986). To the contrary, "[t]he family court may consider all relevant conduct by the parent." Id. at 37, 348 S.E.2d at 171.
Although the Mother frames her move to Memphis as "required" by her job, we find no support for this characterization of her decision to move. She did have a job opportunity in Memphis, but it is clear from the Mother's own testimony that she moved to get away from her old friends and family that she perceived to be a negative force in her life. Although the Mother may have had good intentions in moving, she made little effort to keep in touch with her daughter once she moved. The job she moved for did not materialize until April, and Mother admits she began using drugs in addition to drinking heavily after she moved to Memphis.
The family court is required to take the distance between mother and child into consideration. The distance between Mother and Child in this case was by the Mother's own making, and the Mother made little to no effort to maintain a relationship with the Child with letters or phone calls when physical visits were not possible. See Leone v. Dilullo, 294 S.C. 410, 365 S.E.2d 39 (Ct.App.1988) (affirming TPR for failure to visit when mother lived in Connecticut and children lived in SC despite mother's poor financial circumstances in part because the mother made no effort to communicate by mail or phone). In our opinion, this amounts to "a settled purpose to forego parental duties" under Broome and Leone. Failure to follow a court-ordered treatment plan can result in termination of visitation rights, as it did in this case. As such, although the Mother eventually sought and successfully completed treatment, her failure to do so within a reasonable time is further evidence of her wilful failure to visitof her intent to "forego parental duties."

*612 B. Failure to Support
Pursuant to § 20-7-1572(4), the family court may order the termination of parental rights if
the child has lived outside of the home of either parent for a period of six months, and during that time the parent has wilfully failed to support the child. Failure to support means that the parent has failed to make a material contribution to the child's care. A material contribution consists of either financial contributions according to the parent's means or contributions of food, clothing, shelter, or other necessities for the care of the child according to the parent's means. The court may consider all relevant circumstances in determining whether or not the parent has wilfully failed to support the child, including requests for support by the custodian and the ability of the parent to provide the support.
S.C.Code Ann. § 20-7-1572(4) (Supp.2000) (emphasis added). Just as it does in determining wilful failure to visit, the family court has wide discretion in determining whether a failure to support is wilful. Broome, 307 S.C. 48, 413 S.E.2d 835.
In this case, Mother made some child support payments after she was initially ordered to pay child support beginning January 1, 1997. Mother stopped making payments in April 1997. She entered Grace House in August 1997, and resided there without working until February 1998. When Mother was released from Grace House, she resumed support payments until June 1998, after which Mother inexplicably quit making any support payments for the next 16 months. Mother claims that she believed her parental rights had been terminated, but this is inconsistent with her temporary resumption of payments in February 1998, and with her claims that she tried to reach DSS, specifically, Ms. Kellar, during this time. Further, Mother called the Child's current case manager, Ms. Keitt, in December 1997, and, presumably, could have found her number again to check on her Child's status.
Although Mother had caught up with her support payments by the time of the TPR hearing, the family court is able to look beyond the months immediately preceding the TPR action at the Mother's overall conduct. Based on the above *613 facts, there was clear and convincing evidence to support the family court's finding of willful failure to support.
Additionally, the family court found that TPR was in the Child's best interest. We agree. As this Court noted in Joiner, the purpose of the TPR statute is
to establish procedures for reasonable and compassionate termination of parental rights ... to protect the health and welfare of these children and make them eligible for adoption by persons who will provide a suitable home environment and the love and care necessary for a happy, healthful, and productive life.
Joiner, 342 S.C. at 108, 536 S.E.2d at 375 (citing S.C.Code Ann. § 20-7-1560 (Supp.2000)). To that end, "the interests of the child shall prevail if the child's interest and the parental rights conflict." S.C.Code Ann. § 20-7-1578.
In this case, the Child has now been in custody since June 1996, for nearly seven years. The Child had emotional and behavioral problems which caused her placement to be difficult and which continue to pose placement challenges for her. At the time of the hearing in November 2000, the Child had lived with the same foster parents since March 1998. The Child expressed to her therapist, Dr. McClain, and to the family court judge that she wants her mother's rights to be terminated so she will be available for adoption. Additionally, Dr. McClain believes TPR is in the Child's best interest. Based on these facts, we find termination is in the Child's best interest.

II.
Mother claims that termination of parental rights is not justified based solely on a finding that the Child has been in foster care for 15 of the most recent 22 months under S.C.Code Ann. § 20-7-1572(8). As we have found clear and convincing evidence exists to affirm TPR based on willful failure to visit and support, we decline to address this issue.

CONCLUSION
For the foregoing reasons, we AFFIRM AS MODIFIED the family court's termination of Mother's parental rights *614 based on S.C.Code Ann. § 20-7-1572(3) & (4), and decline to address termination under section 20-7-1572(8).
MOORE, WALLER, BURNETT, JJ., concur.
PLEICONES, J., concurring in result only.
NOTES
[1] The Child's father did not contest the termination of his parental rights.
[2] The treatment plan called for the Mother (1) to receive a mental health evaluation and to enroll in out-patient counseling, (2) to complete a Parent Effectiveness Training program, (3) to participate in anger management counseling, (4) to complete a psychological evaluation, (5) to receive an alcohol and drug assessment and follow recommendations made in that assessment, and, finally, (5) to secure and maintain appropriate housing.
[3] The Mother testified that she was having difficulty holding a good job in Berkeley County while trying to complete her treatment plan, and was offered a construction job working on a project in Memphis being paid around $8.00/hour. When the Mother left for Memphis, she had not completed any of the requirements of her treatment plan, but Mother claims Ms. Kellar encouraged her to move to Memphis.
[4] Ms. Keitt was appointed as the Child's case manager in October 1997, after the Mother's visitation was terminated for failure to complete her treatment plan in September 1997.
[5] When the Mother called Ms. Keitt in September 1999, Ms. Keitt asked her why she had not been in touch since December 1997. The Mother responded that she could not pick up the certified letters from the post office because her wallet and I.D. card had been stolen, and that she had tried calling Ms. Kellar, the former case manager. Ms. Keitt testified that any correspondence sent to Ms. Kellar would have been forwarded to her as the case manager of record since October 1997.
[6] At the time of the TPR hearing, the Mother had only had one supervised visit with the Child, and the Child (then 12 years old) expressed that she did not want to see the Mother again.
[7] DSS claims that the family court based TPR on the Mother's failure to remedy the conditions which caused the removal under S.C.Code Ann. § 20-7-1572(2). The Mother refutes that the court made this finding, and we cannot find any direct reference to it in the final TPR order.
[8] The Child had been in DSS' custody for four and a half years at the time of the TPR hearing. Currently, the Child has been living away from the Mother for almost seven years. She was 8 when she was taken into protective custody and will have her 15th birthday on June 20, 2003.
[9] The Mother testified that Ms. Kellar advised her she could not visit her Child any more in November 1996. However, there is no record of such a statement in DSS's file and no order to that effect in the record.