690 S.E.2d 573

**John DOE, Respondent,**

v.

**Jane ROE, Petitioner.**

**No. 26779.**

Supreme Court of South Carolina.

Heard Dec. 1, 2009.

Decided March 1, 2010.

Emma Isabelle Bryson, of Baker, Ravenel & Bender, of Columbia, for Petitioner.

Holly Huggins Wall, of Johnsonville, for Respondent.

Patricia Lynn Forbis, of Columbia, Guardian Ad Litem.

Justice WALLER.

In this family court case, we granted petitioner's request for a writ of certiorari to review the Court of Appeals' decision in *Doe v. Roe*, 379 S.C. 291, 665 S.E.2d 182 (Ct.App.2008). We reverse.

## PROCEDURAL BACKGROUND

This case involves the biological child of petitioner Jane Roe (Mother) and respondent John Doe (Father). The child (Daughter) was born on March 6, 2005. In December 2005, when Daughter was **nine months old,** Father filed suit seeking paternity testing, and primary custody or visitation.

Mother answered, admitted Father was the biological father, and sought termination of Father's parental rights.

In October 2006, when daughter was 19 months old, the family court held a hearing. All the parties—i.e., Mother, Father, and the guardian ad litem (GAL) for Daughter— agreed to proceed on Mother's termination of parental rights (TPR) counterclaim first. The family court issued a final order in December 2006 which found that Father had: (1) willfully failed to pay support for Daughter for a period in excess of six months, and (2) willfully failed to visit the child for a period in excess of six months. Additionally, the family court found that termination of Father's parental rights would be in the best interest of Daughter. Therefore, the family court ordered that Father's rights and obligations to Daughter be terminated.

Father appealed, and the Court of Appeals reversed and remanded. The Court of Appeals held that the family court had erred by determining TPR was in Daughter's best interest. The Court of Appeals stated that TPR "is premature at this juncture and is, therefore, not in [Daughter's] best interest." [1] *Doe v. Roe*, 379 S.C. at 300, 665 S.E.2d at 187. Furthermore, the Court of Appeals remanded to the family court "to issue an order of visitation and to establish Father's duty of support." *Id.* We thereafter granted Mother's petition for a writ of certiorari.

## FACTS

In July 2004, Mother found out she was pregnant and informed both Father and another man she was dating about the pregnancy. Mother told both men that either one could be the biological father. Mother and the other man (Fiancé) resumed an exclusive relationship in December 2004 when Mother was six months pregnant; they became engaged in May 2005.

When Mother was about three or four months pregnant, she, Father, and Fiancé had lunch together and discussed the costs of paternity testing. They decided to split the cost of

---

1. Because of its ruling on best interest, the Court of Appeals did not address Father's argument that the family court erred in finding there was clear and convincing evidence proving the statutory grounds of willful failure to visit and willful failure to support.

the test. At Father's suggestion, they agreed to only test Fiancé because it was cheaper than doing two tests. Mother explained that because they were all college students, money was an issue.[2] Fiancé ordered the paternity test.

Although Father attended one prenatal appointment when Mother had a sonogram, it was Fiancé who went to almost all the other prenatal appointments with Mother. Fiancé also became Mother's birthing coach. Although Father did arrive at the hospital on the day of Daughter's birth, Fiancé was present in the delivery room. Fiancé testified that when Father was at the hospital, he asked Father about paying his share of the paternity test, but Father did not have the money.

The day after Daughter was born, Father and Fiancé were both in Mother's hospital room. In the afternoon, shortly after Mother's own father (Grandfather) arrived, Mother asked Grandfather to get Father to leave. Grandfather spoke to Father outside the room and asked him to leave because Mother no longer wanted him in the room. Grandfather stated that Father was not receptive to leaving; according to Grandfather, he explained that if Father did not leave, hospital security would be called.

Later that week, Father went to Grandfather's apartment to talk. Grandfather testified that he tried to explain how parenthood meant both rights and responsibilities, and if Father was not ready for the responsibility then he needed to give up his parental rights. According to Father, however, Grandfather used a threatening tone during this conversation. Father acknowledged that Grandfather brought up the subject of child support and later emailed him the DSS website link for the child support calculator.

Fiancé did the paternity test at the hospital, and on March 15, 2005, the results came back that Fiancé was **excluded** as

---

2. Mother and Father both attended Clemson University. Mother graduated *cum laude* in December 2004. Father attended Clemson "off and on" for over seven years, starting in 1997 and last attending in Fall semester 2004. Father testified that when he left Clemson, he did not have a high enough grade point average to continue as a Clemson student. At the time of the family court hearing, Father was 27 years old, had not completed his college education, and had approximately $30,000 in student loans, several of which had been co-signed and serviced by his mother and his sister.

the biological father of Daughter. At Mother's request, Grandfather called Father and informed him of the results of the paternity test. That same day, Mother sent Father an email with photos of the baby. Two days later, Father's own mother visited Mother and the baby; Mother emailed Father with photos of that visit and asked him to forward them to his mother.

Father testified at the family court hearing that since Daughter's birth he had not paid one penny of financial support and had not had any visitation with Daughter. Approximately one year after she was born, he opened a bank account for Daughter but **in his own name.** At the time of the hearing there was $1,655.81 in the account. He admitted, however, that he had "borrowed" from this bank account more than once. He stated he had been told that Mother did not want his money or to be contacted by him.

Father testified extensively about his spotty work history and criminal record. He has convictions for driving under the influence (DUI) in September 2003 and driving under suspension (DUS) in March 2005.[3] In October 2003, Father was charged with contributing to the delinquency of a minor after he was caught in a car, partially dressed, with an underage girl. Eventually this charge was dismissed in January 2006.[4]

At the time of the hearing, Father was living with his mother. He has never paid for his own health or car insurance, and he stated that his mother had paid the retainer fee for his attorney in this lawsuit.[5] Father does not work in the

---

3. On the day Daughter was born, Father drove to the hospital even though his license was suspended. Indeed, Father admitted to driving during the entire time period his license was suspended, from June 2003 until June 2005. Moreover, although Father's 30–day jail sentence on the DUI was suspended upon 48 hours of community service, he failed to perform the community service and spent three weeks in jail.

4. Father was under bond restrictions while the contributing to the delinquency of a minor charge was pending. One of the restrictions was that Father could not leave the state of South Carolina. Father did, however, live in both Georgia and Florida during this time period.

5. According to Father, he pays his mother $100 per month toward expenses.

graphic design field which is what he studied at Clemson. In October 2006, Father was working a job for $10 per hour and no benefits. When asked about his income, he stated he had—in October—"already surpassed 10,000" dollars of taxable income for that year. Father also acknowledged that he frequently has been in arrears on both his student loans and other debt obligations.

Mother, on the other hand, has worked a steady, full-time job with benefits since graduating from Clemson; at the time of the hearing in October 2006, Mother owned a townhouse.[6] Fiancé, a 26–year–old full-time member of the South Carolina National Guard, had just returned from 13 months of active military service in Afghanistan. Both Mother and Fiancé testified that Fiancé was actively involved in Daughter's life prior to his deployment, and had kept up communications while overseas; additionally, Fiancé stated he loves Daughter and would like to adopt her.

Finally, the GAL expressed her opinion to the family court that it would be in Daughter's best interest for Father's parental rights to be terminated.

## ISSUE

Did the Court of Appeals err in reversing the family court's decision to terminate Father's parental rights to Daughter?

## STANDARD OF REVIEW

 Grounds for termination of parental rights must be proven by clear and convincing evidence. *E.g., S.C. Dep't of Soc. Servs. v. Headden,* 354 S.C. 602, 608–09, 582 S.E.2d 419, 423 (2003). Upon appellate review, this Court may make its own conclusion from the record as to whether clear and convincing evidence supports the termination. *Id.* The appellate court, however, is not required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative

---

6. Mother took three months maternity leave, but otherwise has maintained full-time employment at one company. She lived with her mother prior to buying her own home.

weight to their testimony. *E.g., S.C. Dep't of Soc. Servs. v. Seegars,* 367 S.C. 623, 627 S.E.2d 718 (2006).

## DISCUSSION

The TPR procedures are governed by statute. *See* S.C.Code Ann. § 63–7–2510 *et seq.* (Supp. 2008);[7] *Charleston County Dep't of Soc. Servs. v. King,* 369 S.C. 96, 104, 631 S.E.2d 239, 243 (2006). The purpose of the TPR statute is:

[T]o establish procedures for the reasonable and compassionate termination of parental rights where children are abused, neglected, **or abandoned** in order to protect the health and welfare of these children and make them eligible for adoption by persons who will provide a suitable home environment and the love and care necessary for a happy, healthful, and productive life.

S.C.Code Ann. § 63–7–2510 (emphasis added).

Moreover, the TPR statutes "must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and control of their parents by terminating the parent-child relationship. **The interests of the child shall prevail if the child's interest and the parental rights conflict.**" § 63–7–2620 (emphasis added); *see also Joiner v. Rivas,* 342 S.C. 102, 536 S.E.2d 372 (2000) (overruling prior cases calling for strict construction of the TPR statutes).

The family court may order TPR upon a finding of one or more delineated grounds **and** a finding that termination is in the best interest of the child. S.C.Code Ann. § 63–7–2570. The two statutory grounds asserted in this case are the willful failure to support and the willful failure to visit, defined statutorily as follows:

(3) **The child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to visit the child.** The court may attach little or no weight to incidental visitations, but it must be shown that the parent was not prevented from visiting by the party having custody or by court order. The distance of the child's placement from the parent's home

---

7. The TPR statute was previously codified at §§ 20–7–1560 *et seq.*

must be taken into consideration when determining the ability to visit.

(4) **The child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to support the child.** Failure to support means that the parent has failed to make a material contribution to the child's care. A material contribution consists of either financial contributions according to the parent's means or contributions of food, clothing, shelter, or other necessities for the care of the child according to the parent's means. The court may consider all relevant circumstances in determining whether or not the parent has wilfully failed to support the child, including requests for support by the custodian and the ability of the parent to provide support.

*Id.* (emphasis added).

█ We find the evidence clearly and convincingly supports that Father willfully failed to visit and support Daughter for over six months. Father was definitively on notice that he was the biological father from March 15, 2005 (when Fiancé was excluded by the DNA test), yet Father failed to take legal action until nine months later. In the interim, his brief and few contacts were with Mother only, and he never requested visitation with Daughter and never sent any financial support.[8] Accordingly, we hold the family court properly found that these statutory grounds were met.

█ Thus, the dispositive issue is whether it is within Daughter's best interest to have Father's parental rights terminated.

Father's behavior as it relates to the statutory grounds for termination is appropriately reviewed for purposes of the best interest analysis because such conduct "evinces a settled pur-

---

**8.** The family court recognized that Father claimed he did not ask to visit Daughter because Grandfather told him not to make contact and had threatened him. There was a factual dispute about Father's discussions with Grandfather, and the family court specifically found Grandfather's testimony "more credible" than Father's. Significantly, the family court also noted that "whether the alleged conversation took place is not material to the outcome of the case. **The alleged conversation would not have been a sufficient excuse for failing to visit or to ask to visit [Daughter].**" We agree with the family court.

pose to forego parental duties." *S.C. Dep't of Soc. Servs. v. Headden*, 354 S.C. at 610, 582 S.E.2d at 423 (citation omitted). Here, Father without a doubt did not even attempt to fulfill his parental duties of support and visitation. Although we recognize Father filed this action and sought visitation when Daughter was nine months old, we nonetheless hold that this action simply "came too late" for it to have any significant import. *Id.* at 611, 582 S.E.2d at 423.

In addition to the evidence which supports the statutory grounds of failing to visit and failing to support, we note the following facts and their impact on the best interest analysis.

First, we find Father's work history reflects an inability to keep a job and several instances of being fired for cause. The testimony at the hearing shows he is not financially independent. Moreover, Father's criminal record is cause for concern. Collectively, this evidence not only indicates that he would likely continue to have trouble meeting his financial obligations toward the child, but more importantly, it also evinces a high level of both instability and immaturity that is inherently contrary to the best interest of Daughter.

Second, Father could produce no evidence that he ever asked for visitation with Daughter prior to filing the lawsuit. Yet, the testimony showed Mother generally responded to Father's attempts to communicate with her; moreover, his own mother had visited with Daughter after she came home from the hospital. Thus, there was no apparent roadblock to Father visiting Daughter. What this signifies is that Father was consciously indifferent to the rights—and emotional needs—of his infant daughter for at least nine months. *Cf. Abernathy v. Baby Boy*, 313 S.C. 27, 31, 437 S.E.2d 25, 28 (1993) ("[P]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.") (citations omitted).

We now turn briefly to the Court of Appeals' opinion which found that the family court erred in ordering TPR. The Court of Appeals stated the following:

[T]here is no indication that terminating Father's rights will ensure future stability for [Daughter] or that keeping Father's parental rights intact will disrupt [Daughter's] current living situation. Instead, keeping Father's parental

rights intact simply allows Father to establish a relationship with [Daughter] and to provide emotional and financial support for [Daughter]. While we acknowledge that there is some evidence to suggest that Mother had plans to marry and that Fiancé may adopt [Daughter], these plans have not been finalized. Further, at oral argument, nearly three years after Mother's engagement, counsel was unable to confirm such plans. **Thus, while we recognize that a stable family relationship may be in a child's best interest, we find the request herein to be premature based on the record presented. If anything, given Mother's situation and Father's demonstrated desire to establish a relationship with [Daughter], we find that keeping Father's rights intact under these circumstances will only serve to benefit [Daughter] by allowing the familial bond between Father and [Daughter] to be furthered.**

*Doe v. Roe,* 379 S.C. at 298–99, 665 S.E.2d at 186.

Mother argues the Court of Appeals erred in concluding there is "no indication that terminating Father's rights will ensure future stability for [Daughter] or that keeping Father's parental rights intact will disrupt [Daughter's] current living situation." We agree with Mother. At the time of the hearing, Mother and Fiancé had established a solid relationship with Daughter, who was at that time 19 months old. In stark contrast, Father had no relationship with her whatsoever. Fiancé testified he loves Daughter and wants to adopt her. Overturning the family court's decision to terminate Father's rights clearly conflicts with the TPR statute's purpose to make a child eligible for adoption by someone "who will provide a suitable home environment and the love and care necessary for a happy, healthful, and productive life." § 63–7–2510.

Moreover, we find Mother has consistently and appropriately fostered stability for Daughter since her birth. It appears the Court of Appeals inappropriately placed Father's belated interest in fostering a relationship with Daughter above Daughter's significant interest in stability. We reiterate the TPR statute makes clear that if the parent's interests conflict with those of the child, it is **the child's interests** that shall prevail. § 63–7–2620. In the instant case, it is more important that Daughter's stability be maintained. We note that

the TPR statute clearly states that **six months** is the appropriate time period for parental action. § 63–7–2570; *see also Arscott v. Bacon*, 351 S.C. 44, 54, 567 S.E.2d 898, 903 (Ct.App. 2002) ("doubt as to paternity does not totally absolve a putative father of his responsibility to take steps to protect his rights"). Father was put on notice by Mother in July 2004 that he could be the father of her unborn child, and was definitively put on notice in March 2005 that he was the **likely** biological father. Father failed to take any actions—legal or otherwise—for nine months with no justifiable reason for this delay.

▪ Finally, we disagree with the Court of Appeals that any TPR decision is "premature." On the contrary, this case was fully ripe for a TPR decision. The statutory requirements for grounds had been met, a GAL had been appointed, extensive discovery had been done, and a full adversarial hearing was held. The record is sufficient for a best interest determination. We hold the family court correctly ruled it was in Daughter's best interest to terminate Father's parental rights.

Accordingly, the Court of Appeals erred in reversing the family court's decision to order TPR. Accordingly, the Court of Appeals' decision is

**REVERSED.**

TOAL, C.J., BEATTY, J. and Acting Justice JAMES E. MOORE, concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES.

I respectfully dissent. Because I believe the Court of Appeals correctly decided the case I would dismiss as improvidently granted.