772 S.E.2d 279
**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,**
v.
**Sheronda D. WILLIAMS and Antwan Boyd, Defendants,**

**Of Whom Sheronda D. Williams is the Appellant.**

**In the interest of a minor under the age of eighteen.**

**Appellate Case No. 2014-000785.**
**No. 5318.**

Court of Appeals of South Carolina.

Heard April 15, 2015.
Decided May 12, 2015.

460

John D. Elliott, of Law Offices of John D. Elliott P.A., of Columbia; and Cody Tarlton Mitchell, of Lucas Warr & White, of Hartsville, for appellant.

Scarlet Bell Moore, of Greenville, for respondent.

Edgar R. Donnald, Jr., of Sumter, for the Guardian ad Litem.

KONDUROS, J.

Sheronda D. Williams (Mother) appeals the family court's order terminating her parental rights to her eight-year-old daughter (Child). On appeal, Mother argues (1) termination of parental rights (TPR) was not in Child's best interest and (2) the permanency plan adopted by the family court does not address Child's needs or interests and should be modified. Because we find TPR is not in Child's best interest, we reverse and remand for a new permanency planning hearing.

**FACTS/PROCEDURAL HISTORY**

In September 2010, Child was placed in emergency protective custody after the Department of Social Services (DSS) received a report alleging Child "had fresh and old bruises on her hip, legs[,] and face." Police officers and DSS determined Mother caused the injuries. After Child was removed, she spoke to a forensic interviewer and disclosed she had been sexually abused. DSS and police officers never determined who perpetrated the sexual abuse.

The family court timely held a merits hearing and determined Mother and her husband, Kelvin, physically neglected Child and her brother and Child was sexually abused by an unknown perpetrator. The family court ordered Mother to undergo a psychological evaluation and follow all recommendations.

Dr. Jessie Michael West, a clinical psychologist, evaluated Mother in February 2011. Dr. West determined Mother had symptoms suggestive of schizophrenia, psycho-affective disorder, or bipolar disorder, and he believed Child "may have a

similar psychiatric disorder [that] would predispose [Mother] to increased anger [and] excessive discipline." Dr. West believed Mother would not be able to parent effectively until her mental conditions were treated. He recommended a psychiatric evaluation and individual counseling for Mother and marital counseling for Mother and Kelvin.

In December 2012, the family court dismissed Kelvin from the action after a paternity test excluded him as the biological father. The family court determined Antwan Boyd (Father) was Child's biological father.

In December 2013, the family court held a TPR hearing. At the hearing, Dr. West testified Child had frequent temper tantrums and needed an adult in the home who could stabilize her. Dr. West opined the combination of Mother's and Child's personalities could create a hostile environment. He believed Child would be a constant stressor on Mother and Mother would need extra support to handle Child's behavior. Dr. West also believed Mother needed medication and counseling to ensure Child's safety.

Demetrius Adams, a DSS caseworker, testified Mother completed parenting classes and a psychological evaluation, obtained stable housing, and completed some counseling. Mother was referred to individual counseling but only attended two sessions and did not complete it. Additionally, Mother did not complete marital counseling. Adams testified Mother visited Child when she could arrange transportation, explaining Mother lived in Bennettsville and Child was placed in West Columbia. She stated Mother was "pretty faithful about visiting [Child] minus a couple of breaks."

Adams admitted Father contacted DSS in 2010, shortly after Child was placed in foster care, indicating he believed he was Child's father. After Father took a paternity test that confirmed he was Child's father, he requested Child be placed with him. Because Father lived in North Carolina, DSS sought a home study through the Interstate Compact on the Placement of Children (ICPC).[1] Father later asked DSS to stop the home study and never asked DSS to resume it.

---

1. S.C.Code Ann. § 63–9–2200 (2010).

At the time of the TPR hearing, Child was placed at Three Rivers Residential Facility because she threatened suicide, behaved defiantly, and could not be managed in a therapeutic foster home. She attended an on-site special education school and a "high intensity after class." Child had lived in nine different placements, including relative placement, foster homes, and another residential facility, and she was in her second residential stay at Three Rivers. Child had directed abuse and other abnormal behaviors toward other children, and Adams believed it would be difficult for Child to be in a home with other children. Adams stated DSS had identified a single female without any children who lived in North Carolina as someone who might be interested in adopting Child. According to Adams, the potential adoptive parent was a nurse who was trained to deal with children with Child's behavioral issues. Adams believed TPR was in Child's best interest because Child needed the stability and permanency TPR and adoption would provide.

Dr. Ken Master, a child psychiatrist, began treating Child in 2011, when she was about six years old. Dr. Master stated Child had to be restrained about once every other week, and he believed she needed inpatient care because "[s]he was engaging and attacking the staff and peers, spitting on them, [and] doing sexually inappropriate things, ... [and] she wouldn't respond to standard ways of managing her behavior." Dr. Master believed if Child was placed in a home with other children, the other children would be at risk of sexual or physical assault from Child.

According to Dr. Master, Child's primary diagnosis was post-traumatic stress disorder, which was related to her abuse and "multiple moods." Child also had attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder. Dr. Master saw Child weekly and prescribed her medication for ADHD and anger. Dr. Master opined Child was not capable of attending school as a regular student, although it could be possible in the future. When asked whether Child's diagnosis could ever improve, Dr. Master indicated it could with appropriate structure and support. However, he opined Child did not "have any long term or even remote future."

Dr. Master believed Child was in a "no-win situation" because she could not successfully live with Mother and had not been successful in residential treatment centers. Dr. Master described Child as demanding and stated her abuse issues would need to be fully resolved before Child could be safely returned to Mother. Dr. Master also believed it would be "very important" for Mother to complete individual counseling. He did not believe Mother could provide for Child based on the prior abuse, Child's behavioral problems, and Child's demanding needs.

Dr. Master did not know whether visits with Mother caused Child stress. He testified Child was always happy to see Mother; however, he had not observed enough visits to form an opinion. Dr. Master noted that when Child was placed with relatives, they complained Mother's visits were disruptive. However, he stated Child wanted to continue contact with Mother. He also stated Child "ha[d] considerable jealously about" the fact her siblings resided with Mother.

Dr. Master was unfamiliar with the potential adoptive parent or whether she had any special training. He testified no one could predict how Child would do in that placement until that person visited Child and saw "how impaired [Child] really is." Dr. Master stated Child would test whoever she lived with, explaining "she's going to blow up and spit and kick." However, he believed her chances of making it in a new home were "greater than the chance that she [would] make it in the current situation." Dr. Master initially opined there was a 51% chance placement with the potential adoptive parent would work, then later said it was closer to 55%. He stated, "I'm not coming here and saying, yes this is a much better situation. I'm just telling the [c]ourt in my opinion that it's unbalanced. It's a better situation." Dr. Master opined Child would need "a behavioral interventionist in the home for four or five days a week" if she went to the new placement. Although he could not opine about whether the placement would work, he still believed it was a slightly better option because "the current situation [was not] workable."

Dr. Master recommended six months of continued placement at Three Rivers with visitation between Child and the potential adoptive parent. He also recommended exploring

placement with Father during the six-month period, suggesting Father could come once a week for family sessions, they could gradually introduce Father's wife and children in the family sessions, and they could eventually move to off-site visitation. If things went well, Dr. Master opined Child could eventually live in Father's home, "but with intensive wrap around services[,] which means supporters in the home, at least five or six days a week, several hours a day; services in the school; ongoing family therapy; and pharmacological management for [Child]." Dr. Master also believed Father and his wife would need to attend parenting classes for severely disturbed children, explaining sexualized and aggressive children like Child could "create situations where all the other kids get taken out of the home." Dr. Master believed it was very likely Child would have repeated experiences causing her to return to Three Rivers.

When asked whether TPR and adoption were in Child's best interest, Dr. Master explained:

[I]f you had a person who [was capable of parenting Child, then] it would be in [Child's] best interest to go ahead with the TPR if this person was going to work with [Child]. But unless you can provide the information to show that the person is competent [and] that they're interested, then there isn't enough information for me to answer the question. And also that the current situation that she's living in is intolerable.

Following Dr. Master's testimony, the parties agreed DSS would stay the TPR action against Father for six months and Father would complete a treatment plan like the one Dr. Masters recommended. The family court excused Father from the remainder of the proceeding, but the hearing continued against Mother.

Mother admitted Child was removed after she spanked Child and bruised her leg. She stated she was depressed and stressed at that time because her marriage to Kelvin was failing and she was unemployed with two children. Mother testified Child always had behavioral issues, which became worse when she and Kelvin started having problems. She denied sexually abusing Child or knowing who did.

Mother testified she began the first treatment plan but stopped it when she became depressed, completed a psychological evaluation, and intermittently attended counseling. Mother testified her counselor told her they went over everything and left it to her to contact him if she needed to talk. She did not seek further counseling; however, she had counseling sessions with Sharon Woodum, an ordained minister. On cross-examination, Mother conceded she had not completed her treatment plan as of April 2011. Although Mother admitted she did not complete her first treatment plan, she stated she completed "just about everything" since 2012.

At the time of the TPR hearing, Mother had stable housing and employment. She lived with her three-month old child and her one-year old child. Mother believed she was able to care for the children who lived with her and her mood disorder had not caused any further problems. Mother testified she and Kelvin separated in July 2012 but were still married and Kelvin refused to attend marital counseling.

Mother testified she visited Child twice a month when Child was in foster care. Her visitation decreased when Child moved to Three Rivers because Mother did not have transportation, but she visited Child "whenever she could get transportation." Mother believed her visits with Child went well and Child was happy during visits. She stated Child interacted well with her siblings and often said she wanted to live with Mother.

Woodum testified she provided encouragement and spiritual counseling for Mother. However, she admitted she was not a licensed counselor and her advice was based on her ministry rather than a degree in therapy. Woodum often transported Mother to Columbia to visit Child, and she believed the visits went well. She stated Child was "all hugs and kisses" with her siblings. She added, "I've seen like a sadness, emotional time ... whenever we were visiting we were ... just talking and laughing and [Child] ... just automatically said[,'] I don't want to be adopted.'"

The guardian ad litem (the GAL) testified she visited Child "hundreds" of times over a three year period. According to the GAL, Child "very much" wanted to return to Mother. However, the GAL did not believe returning Child to Mother

would be in her best interest. The GAL believed Mother needed individual counseling and marital counseling, but she acknowledged Mother had improved. She was also the GAL for Mother's one-year-old child and was not aware of any issues since that child returned home.

The GAL testified, "The majority of the time [Child] would [say] she does not want to be adopted. However, in the past couple of months she has wavered and said she would be willing to try it." The GAL believed placing Child in an adoptive placement would be "disastrous," explaining, "[Child] is not ready to accept ... another family. She's still holding on hope to see [Mother,] especially after [Mother] started visiting in November. She's obsessed. She's obsessed with going home to her mom."

In her report, which was entered into evidence, the GAL recommended terminating Mother's parental rights "in order for [Child] to heal, move forward, and possibly be placed with a family permanently." She noted no professional believed Mother was capable of parenting Child. The GAL did not believe Father's rights should be terminated, explaining, "Frankly I do not believe [Father] will be able to parent [Child]; however[,] I feel he should be given the opportunity." She continued,

> [Child] has so many issues that must be addressed in order to prepare her for adoption. This child is clinging to the hope of being returned to her family. It is going to take time for her to grieve the loss of not being in this family anymore and once this grieving is done she can begin a healing process.

The family court determined clear and convincing evidence supported the following statutory grounds for TPR: (1) Child was removed from the home, and Mother failed to remedy the conditions causing removal; (2) Mother had a diagnosable condition of mood disorder not otherwise specified that was unlikely to change within a reasonable period of time and that made it unlikely Mother could provide minimally acceptable care for Child; and (3) Child was in foster care for fifteen of the previous twenty-two months. Additionally, the family court found TPR was in Child's best interest and ordered TPR as to Mother. Finally, it determined Child's permanent plan

would be TPR and adoption concurrent with reunification with Father. Mother's appeal followed.

In December 2014, the family court approved an agreement between DSS, Father, and the GAL that provided DSS would dismiss its TPR action against Father and be barred from filing a TPR action against Father based upon grounds that accrued prior to November 20, 2014, and Child's permanent plan would be an extension of services for the purpose of reunification with Father.

## LAW/ANALYSIS

On appeal, Mother argues TPR is not in Child's best interest. We agree.

 The family court may order TPR upon finding a statutory ground for TPR is satisfied and TPR is in the child's best interest. S.C.Code Ann. § 63–7–2570 (Supp.2014). "Because terminating the legal relationship between natural parents and a child is one of the most difficult issues an appellate court has to decide, great caution must be exercised in reviewing termination proceedings and termination is proper only when the evidence clearly and convincingly mandates such a result." *S.C. Dep't of Soc. Servs. v. Roe*, 371 S.C. 450, 455, 639 S.E.2d 165, 168 (Ct.App.2006). On appeal from the family court, this court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *see also Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651–52. The burden is upon the appellant to convince this court the family court erred in its findings. *Id.* at 385, 709 S.E.2d at 652.

 We find DSS presented clear and convincing evidence to prove a statutory ground for TPR.[2] A statutory ground for TPR exists when a child has been removed from

---

2. Although the parties do not raise this issue, we address it ex mero motu. *See Ex parte Roper*, 254 S.C. 558, 563, 176 S.E.2d 175, 177 (1970) ("[W]here the rights and best interests of a minor child are concerned, the court may appropriately raise, ex mero motu, issues not

the parent's home "and has been out of the home for a period of six months following the adoption of a placement plan ... and the parent has not remedied the conditions [that] caused the removal." § 63–7–2570(2). Child was removed from Mother's home in September 2010 after Mother disciplined Child and left bruises on her hip, legs, and face. The family court ordered Mother to complete a placement plan on November 17, 2010. As part of the placement plan, Dr. West evaluated Mother and determined she had mood disorders that needed further treatment and would not be able to parent effectively until her mental conditions were treated. Dr. West recommended a psychiatric evaluation and individual counseling for Mother; however, the record contains no evidence Mother received a psychiatric evaluation, and Mother failed to timely complete individual counseling. Adams testified Mother attended only two sessions of individual counseling and did not complete it. Mother admitted she started and stopped counseling three times and had not completed it as of April 2011. Based on the undisputed evidence of Child's behavioral problems, coupled with Mother's mood disorders, it was imperative for Mother to receive adequate mental health treatment before Child could return home. Mother's failure to do so constitutes clear and convincing evidence to support this statutory ground.[3]

However, we find TPR is not in Child's best interest. In a TPR case, the best interest of the child is the paramount consideration. *S.C. Dep't of Soc. Servs. v. Smith,* 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct.App.2000). "The [interest] of the child shall prevail if the child's interest and the parental rights conflict." S.C.Code Ann. § 63–7–2620 (2010). "Appellate courts must consider the child's perspective, and not the parent's, as the primary concern when determining whether

raised by the parties."); *Galloway v. Galloway,* 249 S.C. 157, 160, 153 S.E.2d 326, 327 (1967) ("The duty to protect the rights of minors has precedence over procedural rules otherwise limiting the scope of review and matters affecting the rights of minors can be considered by this court [e]x mero motu.").

3. Because DSS only needs to prove one statutory ground for TPR, we decline to address the remaining statutory grounds. *See S.C. Dep't of Soc. Servs. v. Headden,* 354 S.C. 602, 613, 582 S.E.2d 419, 425 (2003) (stating an appellate court does not need to address a TPR ground if it finds clear and convincing evidence supports another TPR ground).

TPR is appropriate." *S.C. Dep't of Soc. Servs. v. Sarah W.,* 402 S.C. 324, 343, 741 S.E.2d 739, 749–50 (2013). "The purpose of [the TPR statute] is to establish procedures for the reasonable and compassionate [TPR] where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption. . . ." S.C.Code Ann. § 63–7–2510 (2010).

At present, it does not appear Child will ever be able to return to Mother's home because Mother has not adequately treated her mental conditions. However, we find TPR has no benefit at this time. During oral argument, DSS conceded the current permanent plan was reunification with Father. Terminating Mother's parental rights while continuing to explore placement with Father does not improve Child's future. As long as Father retains parental rights, Child is not free for adoption. *See* § 63–7–2510 (noting the purpose of TPR statutes is to "protect the health and welfare of [abused, neglected, or abandoned] children and make them eligible for adoption"). If reunification with Father is not ultimately an option and DSS decides to pursue adoption, it will first need to terminate Father's parental rights. If so, it can revisit whether terminating Mother's rights is in Child's best interest at that time. For now, TPR is premature because no viable plan gives Child the family she desperately craves. To deprive her of her own family and give her nothing in return is not in her best interest.

Adams testified DSS sought TPR so Child could achieve permanency and stability. At the time of the TPR hearing, Child had lived in nine foster homes in less than two-and-a-half years, she had disrupted all of her prior placements, and she had to be restrained "about once every other week" due to behavioral problems. The GAL testified placing Child in an adoptive placement would be "disastrous," explaining, "[Child was] not ready to accept . . . another family. . . . She's obsessed with going home to her mom." During oral argument, DSS conceded Child did not have a potential adoptive family and DSS was not actively pursuing adoption for Child. Thus, Child will not achieve permanency and stability through TPR at this time.

Further, Child has a meaningful bond with Mother and her biological maternal family. Both Dr. Master and the GAL

testified Child enjoyed visits with Mother. The GAL stated Child wanted to return to Mother. Woodum and Mother both testified Child enjoyed visiting her maternal siblings. During oral argument, when asked what brought Child joy, the GAL replied "her biological family." Thus, it may be beneficial for Child to maintain a relationship with Mother and her maternal biological family.

During oral argument, DSS stated Child currently lives in a therapeutic foster home, attends a self-contained class in a public school, and has not had any significant behavioral problems recently. The GAL stated Child is "the best emotionally" she has seen her in years. DSS stated it recently reengaged Mother in Child's treatment and began allowing Child visitation with Mother. We are encouraged by Child's recent progress and cognizant DSS has allowed Mother to continue to play a role in Child's life. Based on the foregoing, we do not believe clear and convincing evidence shows TPR is in Child's best interest.

Accordingly, we reverse and remand for a permanency planning hearing. We recognize this is a difficult case with no clear answer, and we encourage the family court to carefully consider a permanent plan that involves Child's maternal and paternal families. The family court should also explore the likelihood of Father reapplying and qualifying for placement under the ICPC and whether North Carolina would agree to any potential placement. Finally, we urge the family court to explore, through Child's therapist, whether Child can begin visitation in Mother's and Father's homes. In rare circumstances, the family court can approve an alternative permanent plan, and this may be one of those rare circumstances. *See* S.C.Code Ann. § 63–7–1700(C) (Supp.2014).

Because we reverse and remand for a permanency planning hearing, we need not address Mother's remaining argument. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting an appellate court need not address appellant's remaining issues when its determination of a prior issue is dispositive).

**REVERSED AND REMANDED.**

THOMAS and GEATHERS, JJ., concur.